Filed 8/12/15; On rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GREAT OAKS WATER COMPANY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SANTA CLARA VALLEY WATER DISTRICT,<br><br>    Defendant and Appellant. | H035260<br>(Santa Clara County<br>Super. Ct. No. CV053142) |

Plaintiff Great Oaks Water Company (Great Oaks), a water retailer, brought this action challenging a groundwater extraction fee imposed on water it draws from wells on its property. The power to impose such a fee is vested in defendant Santa Clara Valley Water Management District (the District), under the Santa Clara Valley Water District Act (Stats. 1951, ch. 1405, pp. 3336 et seq., West's Ann. Wat.–Appen. (1999 ed.) ch. 60, pp. 354 et seq.) (District Act or the Act). Among the District's major responsibilities is preventing depletion of the acquifers from which Great Oaks extracts the water it sells. The trial court awarded a complete refund of the charges paid by Great Oaks, and in the alternative a partial refund, on the grounds that the charge violated the provisions of both the District Act and Article XIII D of the California Constitution (Article 13D), which imposes procedural and substantive constraints on fees and charges imposed by local public entities. We hold that (1) the fee is a property-related charge for purposes of Article 13D, and thus subject to some of the constraints of that enactment; (2) however, it

is also a charge for water service, and as such exempt from the requirement of voter ratification; (3) the pre-suit claim submitted by Great Oaks did not preserve any monetary remedy against the District for the violations of Article 13D found by the trial court; and (4) because the matter was treated as a simple action for damages when it should have been treated as a petition for a writ of mandate, the trial court failed to apply a properly deferential standard of review to the question whether the District's setting of the fee, or its use of the resulting proceeds, complied with the District Act. Accordingly, we will reverse the judgment.

BACKGROUND

## A. *The District Act*

Prior to adoption of the District Act, the Santa Clara Valley was plagued by overdraft of the underlying groundwater basin, causing among other things the subsidence of land—with resulting disruption of roads and structures—and the intrusion of salt water into groundwater acquifers.[1] A similar pattern marked much of the American settlement of California.[2] Over the years the Legislature created numerous

---

[1] According to a 1987 report submitted below by the District, "[g]roundwater pumpage increased from 40,000 acre-feet per year in 1915 to 180,000 acre-feet per year in 1960's," resulting in a lowering of the "artesian head" from "near ground surface" to some 150-200 feet in depth. "This drawdown caused a maximum of almost 13 feet of irreversible land subsidence in San Jose by 1969." Saline groundwater, reflecting seawater intrusion, was detected near Palo Alto in 1910, and by 1987 extended east to Milpitas and "south along the Guadalupe River to the San Jose Municipal Airport."

[2] The casebooks, new and old, are full of dramatic examples of groundwater depletion. (See *Pajaro Valley Water Mgmt. Agency v. Amrhein* (2007) 150 Cal.App.4th 1364, 1370 (*Amrhein*); *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 930; *Burr v. Maclay Rancho Water Co.* (1908) 154 Cal. 428, 437-438.) A striking example is *City of San Bernardino v. City of Riverside* (1921) 186 Cal. 7, 11-13, which describes a time when the mere drilling of a well would bring water to the surface over the San Bernadino groundwater basin. By the time that decision was rendered, several thousand such wells had been drilled and the pressure had dropped so that many were no longer capable of producing water without artificial pumping. (*Id.* at p. 13.) This marked the

2

local districts and agencies to address this and other water management issues.  As pertinent here, the Legislature created the District in 1951 by adopting the District Act.[3] (Stats.1951, ch. 1405, pp. 3336 et seq.)  The District's territory is coextensive with the County of Santa Clara.  (District Act, § 2.)  The Act recites the intention that the District will, among other things, "(3) Provide for the conservation and management of . . . water . . . for beneficial and useful purposes, including spreading, storing, retaining, and causing the waters to percolate into the soil within the district.  [¶]  (4) Protect, save, store, recycle, distribute, transfer, exchange, manage, and conserve in any manner any of the waters.  [¶]  (5) Increase and prevent the waste or diminution of the water supply in the district.  [¶]  (6) Obtain, retain, protect, and recycle drainage, stormwater, floodwater, or treated wastewater, or other water from any sources, within or outside the watershed in which the district is located for any beneficial uses within the district."  (District Act, § 4.)

The Act empowers the District to establish zones of benefit within its boundaries and to "institute zone projects for the specific benefit of such zones."  (District Act, § 3.)  It empowers the District to levy property taxes and assessments to pay its general

close of an era which was described nearer its beginning—and nearer to home for purposes of this case—in an 1871 newspaper report that there were then some 400 artesian wells in the Santa Clara Valley, "which owes a considerable part of its wealth to them."  (CDNC, *Daily Alta California* (Feb. 14 , 1871) vol. 23, no. 7633, p. 2 <http://cdnc.ucr.edu/cgi-bin/cdnc?a=d&d=DAC18710214.2.24#> (as of Mar. 11, 2015.) Thirteen years before that, a report in a scientific journal described several wells in Santa Clara county that were observed to "throw up jets some five feet in h[e]ight."  (Scientific American, *Artesian Wells in California* (Feb 27, 1858), vol. 13, iss. 25 <http://www.scientificamerican.com/article/artesian-wells-in-california-1858-02-27/> (as of Mar. 11, 2015.)

[3] The Act was originally entitled "Santa Clara County Flood Control and Water District Act," with the District named accordingly.  (Stats.1951, ch. 1405.)  Both were later renamed to omit the reference to flood control.  (Stats. 1963, ch. 1941, §§ 1, 2, pp. 3993-3994; Stats 1973, ch. 56, pp. 92-93, §§ 1, 2.)

operating costs and activities "of common benefit to the district." (*Id*., § 13, subd. (1).) It also grants the District the power "to levy and collect a ground water charge for the production of water from the ground water supplies within a zone or zones of the district which will benefit from the recharge of underground water supplies or the distribution of imported water in such zone or zones." (*Id*., § 26.) The Act declares such charges to be "in furtherance of district activities in the protection and augmentation of the water supplies for users within a zone or zones of the district which are necessary for the public health, welfare and safety of the people of this State," and authorizes their imposition "upon the production of ground water from all water-producing facilities, whether public or private, within said zone or zones of the district for the benefit of all who rely directly or indirectly upon the ground water supplies of such zone or zones and water imported into such zone or zones." (*Id*., § 26.3 (§ 26.3).) The proceeds of such charges are to be used "exclusively" for four enumerated purposes, discussed in greater detail below. (*Ibid*.; see fn. 23, *post*.)

The Act requires the District to issue an annual report containing "a recommendation as to whether or not a groundwater charge should be levied in any zone or zones of the district during the ensuing water year and, if any groundwater charge is recommended, a proposal of a rate or rates per acre-foot for agricultural water and a rate or rates per acre-foot for all water other than agricultural water for the zone or zones."[4] (District Act, § 26.5, subd. (a).) The District is required to publish the report by the first Tuesday of April, and to hold a hearing on it on the fourth Tuesday of April, following notice to the public with "an invitation to all operators of water-producing facilities . . . and to any person interested in the district's activities . . . to call at the offices of the

---

[4] The Act also provides for mid-year adjustments to the charge, following similar procedures, "whenever the board determines that the imposition or adjustment of the charge is necessary." (District Act, § 26.7, subd. (b)(1).)

4

district to examine the report." (*Id*., § 26.6.) At the hearing, any operator of a water-producing facility, or other interested person, may "appear and submit evidence concerning the subject of the written report." (*Id*., § 26.6.) Before the end of a "[w]ater year," defined as July 1 through June 30 (*id*., § 26.1), the board is to "determine whether or not a groundwater charge should be levied in any zone or zones" (*id*., § 26.7, subd. (a)(1)), and if so, "shall levy, assess, and affix the charge or charges against all persons operating groundwater-producing facilities within the zone or zones during the ensuing water year" (*id*., § 26.7, subd. (a)(2)). The rate within a given zone is to be uniform, except that the rate for agricultural extractions "shall not exceed one-fourth of the rate" for non-agricultural extractions. (*Id*., § 26.7, subd. (a)(3)(D).)

The Act declares that monetary claims against the District "are governed by Part 3 (commencing with Section 900) and Part 4 (commencing with Section 940) of Division 3.6 of Title 1 of the Government Code, except as provided therein. Claims not governed thereby or by other statutes or by ordinances or regulations . . . shall be prepared and presented to the governing body, and all claims shall be audited and paid, in the same manner and with the same effect as are similar claims against the county." (District Act, § 30.)

## B. District's Zones

Although we are directed to no competent evidence on this point, Great Oaks asserted in its trial brief—and the District has never denied—that the District has only two permanent zones, designated W-2 and W-5. Great Oaks described Zone W-2 as comprising approximately 240 square miles in the northern part of the county, while W-5 consists of about 14 square miles in the southern part. They are sometimes referred to as the North County zone and the South County zone, respectively.

At the time of trial, Great Oaks operated 19 wells of which 16 were located in Zone W-2, and three in Zone W-5.

## C.  Notice and Hearings on 2005-2006 Charge

On or about March 1, 2005, the District mailed a "notice of hearings on groundwater charges for 2005-2006" to about 4,500 well owners in the county.  (See pt. I(F)(1), *post*.)  According to later recitals by the board, the accuracy of which is not contested, the written report required by section 26.5 of the Act was duly prepared, and was delivered to the clerk of the board on March 22, 2005.  The board thereafter held hearings on the proposed rates on April 5, April 11, and April 19.  On April 19, 2005, the board adopted Resolution 05-28 setting groundwater charges for 2005-2006.  For extractions in Zone W-2, the per-acre-foot charge was $420 for non-agricultural use and $42 for agricultural use.  In Zone W-5 the respective charges were $215 and $21.50.

## D.  Pre-Suit Claim

On May 20, 2005, Great Oaks submitted a claim to the District under Government Code sections 900 et sequitur.  The sole stated ground for recovery was that the District was "illegally using pump tax revenues for purposes outside the four (4) statutorily specified uses, and that to cover those unauthorized expenditures the amount of the pump tax is excessive."  It was further asserted that the District had "damaged Great Oaks by requiring it to pay more than necessary for the pump tax," such that the District was "indebted to Great Oaks for the amount it charged over and above what was necessary to fulfill the statutorily listed uses for pump tax revenues."  The claim concluded with the statement, "Great Oaks hereby makes a claim for the refund of the amount which it was overcharged for the pump tax and requests that the [District] lower the pump tax and modify its uses of pump tax revenues to come into conformity with the Act."  The District took no action on the claim, causing its rejection by operation of law on July 5, 2005.  (See Gov. Code, § 912.4, subds. (a), (c).)

6

## E. Proceedings Below

Great Oaks filed this action on November 22, 2005. The matter was tried on an amended complaint, filed January 26, 2006, asserting eight causes of action: (1) "Demand for Refund," in that the District was (a) using charges for purposes not authorized by section 26.3, including flood control and revenue pooling; (b) including costs of treated water in the groundwater charge; and (c) imposing an improper tax "in violation of California Constitution Article XIII [*sic*]"; (2) "Improper Pooling of Groundwater Charges" in a common fund with other revenues, in alleged violation of section 26 of the District Act; (3) "Failure to Assess and Collect Groundwater Charge Revenue" from dewatering facilities, in alleged violation of section 26.1 of the Act; (4) "Unfair Competition," in that the District was "setting and collecting groundwater charges to encourage the purchase of its treated surface water"; (5) "Injunction" prohibiting the District from (a) spending groundwater proceeds for uses not authorized by the Act; (b) failing to prohibit the waste of water; (c) using groundwater proceeds to subsidize production of treated water; and (d) failing to obtain voter approval for increases "as required by Article XIII [*sic*[5]] of the California Constitution"; (6) "Declaratory Relief" regarding "the appropriate components of the groundwater charge and the requirements for an affirmative public vote on groundwater charge or tax assessments proposed by the District in excess of [District Act] Section 26 limits"; (7) "Petition for Writ of Mandate" in that the District had abused its discretion "(a) in collecting groundwater charges in excess of the benefits provided to Great Oaks; (b) in

---

[5] As most clearly illustrated by this reference, Great Oaks repeatedly referred to "Article 13" of the California Constitution—which governs the power to tax generally—when it might more cogently have referred to other provisions of the constitution specifically restricting taxation—in particular article 13D, which the trial court ultimately found the District had violated. The joint case management statement, in which the parties purported to limit the "threshold issues" to be considered, made no mention of any claim under article 13D.

creating groundwater charge zones without consideration of whether Great Oaks uses treated surface water; (c) in not collecting groundwater charges as described above; (d) [in] failing to regularly obtain a favorable vote of zone residents before increasing groundwater charges, and (e) in spending the monies collected by the groundwater charge for purposes not authorized by §26.3 of the [District] Act, including but not limited to flood control and revenue pooling"; and (8) "Request for Attorneys Fees . . ." in that Great Oaks was prosecuting the action on behalf of ratepayers, and was thus entitled to fees under Code of Civil Procedure section 1021.5.

A demurrer by the District was sustained without leave to amend as to the unfair competition cause of action, and was otherwise overruled. The District answered the remaining causes of action, generally denying them and asserting 46 affirmative defenses, including failure to give timely and proper notice of all claims under Government Code sections 905 et sequitur.

On June 12, 2008, the parties filed a joint case management statement requesting trial in two phases, the first addressing specified "threshold issues" and the second concerning "appropriate remedies, and any remaining non-substantive issues." The issues to be addressed in "Phase I" were: "(a) Whether the District has violated the District Act, including whether the District abused its discretion, or the Act, in the manner in which it accounts for the collection, use and allocation of groundwater charges; [¶] (b) Whether the District has violated Article XIII of the California Constitution [*sic*; see fn. 5, *ante*]; [¶] (c) Whether the District is required under the District Act to prevent the waste of water under the Water Code and collect groundwater charges for dewatering wells in Santa Clara County." The statement set forth a briefing schedule for these issues, and recited the parties' agreement that "with respect to the issues above, to the extent that Great Oaks does not address in its opening brief a specific expenditure or allocation, or other specific budget item, it will be barred from challenging

8

that item in this case; and to the extent that the District does not raise a defense in its opposition brief, it will be barred from asserting that defense as to the issues tried in Phase 1."

Great Oaks filed a trial brief arguing that the groundwater charge was unlawful in several respects. The first five specifications posited that the charge was imposed on an incident of property ownership and was thus subject to the requirements imposed on such charges by Article 13D. Great Oaks contended that the District had violated that provision by failing to secure voter approval for the charge and failing to give notice and hearing conforming to the article's requirements. It also contended that the charge violated the substantive constraints of Article 13D in that it exceeded the proportionate cost attributable to Great Oaks, included charges for services not used by or immediately available to Great Oaks, and exceeded the sum required to provide the property-related service on which it was assessed. (See Article 13D, § 6, subd. (b)(1).) Great Oaks further contended that the charge violated the District Act in numerous respects, including the District's alleged failure to define zones according to benefits received, as contemplated by the Act; failure to tie the groundwater charge to benefits actually conferred on groundwater supplies; inclusion in the groundwater charge of costs for treating surface water, although Great Oaks received no benefit from such treatment; use of groundwater charges for purposes other than those authorized by the District Act, including "water utility enterprise functions" and watershed projects; use of Water Utility Enterprise funds, including groundwater charge proceeds, to cover a loss of revenues occasioned by the state's interception of $51 million in property taxes; use of Water Utility Enterprise funds, including groundwater charge proceeds, to pay about one-sixth of "general fund overhead," which in turn was applied to such projects as a child care center, solar energy project, residential property, and marketing; reliance on a "pooling policy," in violation of the District Act's restrictions on the use of groundwater charge

9

revenues and in excess of the District's powers under the Act; and failure to assess the groundwater charge on extractions for dewatering purposes, in violation of section 26.1 of the District Act, which requires that the charge be levied on all water producing facilities.

By stipulation, the parties submitted thousands of pages of documentary evidence including declarations and deposition excerpts, as well as live testimony, in support of their respective positions. (See pt. II(B)(3), *post*.) On June 9, 2009, the court issued an amended statement of decision on Phase 1. The court concluded that the groundwater charge was subject to Article 13D because it was "remarkably similar" to the one that this court held subject to that article in *Amrhein, supra,* 150 Cal.App.4th 1364. The court rejected the District's contention that the charge was one for water services and thus exempt from Article 13D's voter approval requirement. It also rejected the contention that the charge fell outside Article 13D insofar as Great Oaks incurred it due to a business activity. It found that the charge did not serve "a significant regulatory purpose." Therefore, the court concluded, the District had violated Article 13D by failing to give the notice prescribed in that provision and by failing to secure the prescribed approval by voters or affected owners.

The court rejected many of Great Oaks's claims concerning violations of the District Act. However it found persuasive Great Oaks's contentions that the District abused its discretion and violated the District Act when it based the groundwater charge not upon a cost-of-service analysis but on suppositions, which the court considered inflated, about the benefits conferred. The court noted that the District had failed to change its ratesetting methodology despite an independent audit in 2000 which concluded that the revenue recovered from some classes of customers might be subsidizing others, and which recommended that the District "review its agricultural water pricing practice for adequacy and fairness." The court also concluded that the District "improperly used

10

groundwater revenue for activities not within the scope of Section 26.3 of the District Act," "unwisely commingled groundwater revenue with other monies," and over-budgeted for specific items, then failed to credit the resulting surpluses back to Great Oaks.

The court rejected the District's contention that Great Oaks had failed to exhaust its administrative remedies, finding that the pre-suit claim submitted by Great Oaks "complied with both the Government Code and Section 30 of the District Act."

For reasons that will appear, it is unnecessary to recapitulate the proceedings in Phase II. Trial proceedings concluded on February 2, 2010, with issuance of a judgment awarding Great Oaks "a refund of groundwater charges in the amount of $4,623,095.52 plus interest." The judgment also awarded $1,306,830 "under the District Act," but recited that the two awards were made "in the alternative," such that Great Oaks could recover one or the other, "but not both." The judgment included a declaration that "(1) The District was required to comply with Article XIII D before imposing the groundwater charge. The District imposed the groundwater charge without complying with Art XIII D, Section 6, including the failure to secure proper voter approval both by failing to comply with proper notice requirements and failing to obtain ballot affirmation; (2) [t]he Defendant violated the District Act by not basing the groundwater charge on the costs of service in accordance with §26.3. As a result, the Plaintiff was overcharged because of, inter alia, subsidies made for treated water, over-budgeting for employees, cost of equipment and water contract purchases; and, (3) the Defendant abused its discretion under the District Act when it improperly used groundwater revenue for activities not within the scope of Section 26.3 of the District Act and when it commingled groundwater revenues with other monies." The court declined to issue an injunction or writ of mandate (see pt. II(B)(2), *post*). It reserved the issues of costs and attorney fees.

District filed a timely notice of appeal.

11

*F. Attorney Fees*

On or about April 5, 2010, Great Oaks filed a motion for reasonable attorney fees under Code of Civil Procedure section 1021.5. The motion asserted that Great Oaks had incurred fees of some $1.45 million, which should be multiplied by a lodestar of two to yield an award of about $2.9 million. By order made and entered on July 19, 2010, the court denied the motion, finding that Great Oaks had "failed to demonstrate that the financial burden of private enforcement was such as to make the award appropriate." Great Oaks filed a timely notice of appeal. We will dispose of that appeal by separate opinion. (See Great Oaks Water Co. v. Santa Clara Valley Water District, No. H035885.)

**DISCUSSION**

*I. Article 13D*

*A. Introduction*

Article 13D was adopted in 1996 as part of Proposition 218. It limits the power of local public entities to impose "assessments, fees, and charges." (Article 13D, § 1.) It is not suggested here that the groundwater charge constitutes an assessment, so the question is whether it constitutes a " '[f]ee' or 'charge.' " The two terms are interchangeable for purposes of Article 13D, which defines them to mean "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person *as an incident of property ownership*, including a user fee or charge for a property related service."[6] (Article 13D, § 2, subd. (e), italics added.) The applicability of the article thus

---

[6] It has not been suggested that the groundwater extraction charge is imposed "upon a parcel." By the terms of the District Act, the charge is imposed "against . . . persons operating groundwater-producing facilities." (District Act, § 26.7, subd. (a)(2).) Great Oaks suggested below that the District relied on parcel maps in imposing the charge and that this favored a finding that the charge fell within Article 13D. (See Article 13D, § 6, subd. (b)(5).) However the trial court found no "particular relevance" in the District's occasional use of parcel maps to help identify pumpers, because the District offered testimony "that it relies primarily on the well records" for that purpose. The court noted our observation in *Amrhein*, *supra*, 150 Cal.App.4th at pp. 1382-1383,

turns on whether the groundwater extraction charge is imposed on Great Oaks "as an incident of property ownership."

If Article 13D applied, it subjected the charge to three requirements. First, it required the District to give advance notice of the proposed charge to affected owners and to conduct a hearing at which owners could submit protests; if a majority of owners lodged such protests, the charge could not go into effect. (Article 13D, § 6, subd. (a).) Second, unless the charge was for "sewer, water, [or] refuse collection services," it could not take effect unless it was ratified by a majority of affected owners or, at District's option, by two-thirds of voters. (*Id*., § 6, subd. (c).) Finally, the charge had to satisfy a number of substantive constraints, essentially to the effect that it be tailored to the benefit conferred on each affected parcel or owner. (*Id*., § 6, subd. (b).)

The trial court found that the extraction charge was a property-related charge and that the District failed to comply with the notice-and-hearing requirement or the voter-ratification requirement.[7] We have concluded that (1) the charge was indeed property-related for purposes of Article 13D; (2) the charge was one for water service and thus exempt from the voter ratification requirement; and (3) while the charge was subject to the notice-and-hearing requirement, the procedures followed by the District  satisfied that requirement. Accordingly, the trial court's conclusion that the charge violates Article 13D cannot be sustained.

---

that an agency's consultation of parcel maps "to determine who owned the land on which wells were situated" did not establish that the charge was assessed on real property.

[7] Because the trial court granted declaratory relief on this point, we must address it even though, as we conclude below, Great Oaks failed to preserve a claim to monetary relief on these grounds. (See pt. I(H), *post*.)

### B. *Standard of Review*

The characterization of a fee or charge for purposes of Article 13D presents " 'a question of law for the appellate courts to decide on independent review of the facts.' " (*Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836 (*Apartment Ass'n*), quoting *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874; see *California Farm Bureau Federation v. State Water Resources Control Board* (2011) 51 Cal.4th 421, 436 (*Farm Bureau*); cf. *Greene v. Marin County Flood Control and Water Conservation Dist.* (2010) 49 Cal.4th 277, 287, citing *Apartment Ass'n*, *supra*, at p. 836 ["We review questions of law about the meaning of Proposition 218, as other questions of law, de novo."]; see *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586, 590 (*Griffith*); *Howard Jarvis Taxpayers Assn. v. City of Salinas* (2002) 98 Cal.App.4th 1351, 1354-1359; *Silicon Valley Taxpayers Assn, Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 449-450 (*Silicon Valley*).)

Great Oaks agrees that we should "employ a *de novo* standard of review when examining the District's assertions of error under Article XIIID, exercising [our] independent judgment in reviewing the District's levy and collection of groundwater charges." However, Great Oaks emphasizes that Article 13D "shift[s] the burden of proof of procedural and substantive compliance with Article XIIID to the local agency." (Emphasis omitted.) It thus alludes to, but does not cite, Article 13D, section 6, subdivision (b)(5), which states, "In any legal action contesting the validity of a fee or charge, the burden shall be on the agency, *to demonstrate compliance with this article*." The plain meaning of this language is that *once a charge is found to be subject to Article 13D's constraints*, the agency has the burden of demonstrating that it in fact conforms to those constraints. (See *Farm Bureau*, *supra*, 51 Cal.4th at p. 436 [challenger has burden of proof "to establish a prima facie case showing that the fee is invalid"].) Here we are

14

addressing the threshold question whether the trial court properly found the charge subject to Article 13D's constraints. Article 13D does not purport, by its terms, to dictate a burden of proof, let alone a standard of review, on that question. However, as the authorities cited in the previous paragraph establish, the distinction seems to be without practical significance, because a de novo standard of review applies in either case. (See *Silicon Valley*, *supra*, 44 Cal.4th at p. 450, fn. omitted [parallel provision concerning assessments was intended to eliminate judicial deference to agency action; "courts should exercise their independent judgment in reviewing whether assessments that local agencies impose violate article XIIID"].)

Of course, application of an independent standard of review does not require or permit us to substitute our judgment for that of the trial court on purely factual questions as to which the trial court's finding is supported by substantial evidence. (See *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 917, review denied May 14, 2014 ["*Silicon Valley* . . . does not change the substantial evidence standard of review and does not allow us to independently resolve issues of disputed fact already decided by the trial court."].) It does not appear, however, that the trial court's imposition of liability under Article 13D depends on any such factual issues.

### C. Property-Related Charge

In two previous opinions we have contended with the issue of Article 13D's applicability to groundwater extraction charges resembling the one at issue here. (See *Amrhein*, *supra*, 150 Cal.App.4th 1364; *Griffith*, *supra*, 220 Cal.App.4th 586.) Our further study of the matter has led us to conclude that any charge on the extraction of groundwater will typically place a direct burden on an interest in real property and is thus incidental to property ownership. This is because any extraction of groundwater by a longtime extractor like Great Oaks is almost certain to involve the exercise of a right in

15

real property. Since a charge on that activity directly burdens the exercise of that right, it must be deemed incidental to it, and thus to ownership of real property.

Under California law, a right to extract groundwater typically falls into one of three categories: overlying, appropriative, or prescriptive.[8] (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1240 (*Barstow*).) Prescriptive rights need not concern us here, but it is clear that overlying and appropriative rights are rights in real property.

An overlying right is the right of the owner of land to extract as much of the water lying under it as can be beneficially used on it. (*Barstow*, *supra*, 23 Cal.4th at p. 1240.) Such a right is incidental to property ownership in two senses: First, " 'it is based on the ownership of the land and is appurtenant thereto' " (*Ibid*, quoting *California Water Service Co. v. Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715, 725 (*California Water Service*)); second, its exercise directly benefits—indeed it can *only* be exercised to benefit—the overlying land (see *Barstow*, *supra,* at p. 1240 [right is " 'to take water from the ground underneath for use on [owner's] land within the basin or watershed' " and is "restricted to a reasonable beneficial use"]). As an appurtenance to land such a right is itself a form of real property. (See Civ. Code, § 658.) That it is incidental to ownership of the property also follows from the statutory definition of "appurtenant" as a synonym of "incidental." (Civ. Code, § 662 ["A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way, or watercourse, or of a passage for light, air, or heat from or across the land of another."].)

---

[8] For the most part, rights to groundwater resemble those to surface water in this regard, and the same terminology is employed, with the exception that the right to take surface water for use on adjacent land is labeled "riparian," while the comparable right to groundwater is labeled "overlying."

It follows that any charge imposed upon the exercise of an overlying right directly burdens, and must be considered incidental to, the ownership of property.

An appropriative right differs from an overlying right in that it does not depend on ownership of overlying land.[9] It consists of a right to extract water for beneficial use on any land to which the appropriator may choose to conduct it. "Any water not needed for the reasonable beneficial use of those having prior rights is excess or surplus water and may rightly be appropriated on privately owned land for non-overlying use, such as devotion to public use or exportation beyond the basin or watershed [citation].' " (*Barstow*, *supra*, 23 Cal.4th at p. 1241, quoting *California Water Service Co. v. Edward Sidebotham & Son*, *supra*, 224 Cal.App.2d at p. 725; see *People v. Shirokow* (1980) 26 Cal.3d 301, 307 ["The appropriation doctrine contemplates the diversion of water and applies to 'any taking of water for other than riparian or overlying uses.' "]; *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 101 ["The appropriation doctrine confers upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators."].)

This of course describes nearly all of the extractions at issue here. In a supplemental letter brief, Great Oaks asserted somewhat vaguely that some of the water it extracts is reserved for its own use. No thanks to it, we have found some comparably vague evidence to similar effect in the record. It is undisputed, however, that the vast majority of water extracted by Great Oaks is not put to beneficial use upon its own land, but is sold to others for their (presumably beneficial) use. The right thus exercised—and burdened by the extraction charge—is that of an appropriator, not an overlying owner.

---

[9] As a practical matter, of course, one cannot extract groundwater without occupying enough surface land to operate a well. But this might be accomplished by lease or license, without any ownership interest in the surface land.

17

We have nonetheless found authority to the effect that when a landowner operates a waterworks for commercial distribution of water to persons beyond his or her property, both the works and any distribution system connected to it are appurtenances to the owner's property. (*Trask v. Moore* (1944) 24 Cal.2d 365, 370; see *Garden Water Corp. v. Fambrough* (1966) 245 Cal.App.2d 324, 327 [trial court properly found water system for distribution to subdivision homes was real property] ; *Harper v. Buckles* (1937) 19 Cal.App.2d 481, 484-485 [cited and followed in *Trask, supra,* 24 Cal.2d 365].) To the extent these suggestions are correct, it would seem to follow that the appropriative water right being exercised by such an owner, if not severed by some intervening act, is also appurtenant to the land where the works are situated. To the extent appropriative rights are appurtenant to specific parcels of land, any charge directly burdening their exercise must be considered incidental to property ownership for the same reasons we have cited with respect to extraction for overlying use.[10]

---

[10] Some cases contain language that might be understood to mean that *all* appropriative rights are *necessarily* appurtenant to land. (See, e.g., *Nicoll v. Rudnick* (2008) 160 Cal.App.4th 550, 558, quoting *Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 598 [" 'The concept of an appropriative water right is a real property interest incidental and appurtenant to land.' "]; *Senior v. Anderson* (1903) 138 Cal. 716, 723.) Such a proposition is difficult to harmonize with general principles of property law. It is of course often the case that an appropriative right has been exclusively devoted to the benefit of particular land, and has thereby become appurtenant to that land. (See, e.g., cf. *Wright v. Best* (1942) 19 Cal.2d 368, 377 [appropriative right, "by successive conveyances" had "become appurtenant" to specified ranch]; *Nicoll v. Rudnick*, *supra,* 160 Cal.App.4th 550, 554 [earlier judgment "indicated that the individual water rights adjudicated therein were appurtenant to each party's real estate on which the appropriated water was used for beneficial purposes"]; *Senior v. Anderson, supra,* 138 Cal. At p. 723 [where water was "originally appropriated" by homesteader "for use on his land," right "thus became appurtenant thereto"]; *Stanislaus Water Co. v. Bachman* (1908) 152 Cal. 716, 724 ["when acquired," contractual right to delivery of water to irrigate specific land "became an easement appurtenant to the land" which passed with land on foreclosure of mortgage]; *Farmer v. Ukiah Water Co.* (1880) 56 Cal. 11, 15 [water right granted to landowner and used on specific parcel was conveyed with transfer of parcel despite absence of specification to that effect in deed]; *Hudson v. Ukiah Water & Imp.*

18

More basically, however, it appears that an appropriative right, in and of itself, is a kind of real property for at least some purposes, whether or not it is appurtenant to a particular dominant estate. (See *Wright v. Best*, *supra*, 19 Cal.2d at p. 380 ["a water right by appropriation is independent of ownership and possession of land and subject to sale separately from it"]; *id.* at p. 381 [party's predecessor "was the owner of an appropriative right, severable and alienable from the land to which it is appurtenant"]; *id.* at p. 382

---

*Co.* (1918) 177 Cal. 498, 502 [later case involving same property: "It is because the water was used with the land for its benefit that it was held to be appurtenant to the land in question."]; *Graham v. Pasadena Land & Water Co.* (1908) 152 Cal. 596, 597 [where bylaws of grantee growers' association provided that water rights conveyed to plaintiff should be used on his land, right was "clearly appurtenant" to land].)

But appurtenance to specific land is neither intrinsic nor necessary to the existence of an appropriative right. (See *Nicoll v. Rudnick*, *supra*, 160 Cal.App.4th at p. 560, quoting *Davis v. Gale* (1867) 32 Cal. 26, 34, italics removed [upon acquiring appropriative right, owner " '*becomes entitled to the use of the quantity which he has appropriated at any place where he may choose to convey it, and for any useful and beneficial purpose to which he may choose to apply it*' "]; *City of San Bernardino v. City of Riverside, supra,* 186 Cal. 7, 28-29 [appropriator may "change the place of use thereof, or the character of the use, without affecting his right to take it" and "may change the place from whence the water is taken out of the source, provided others are not injured by such change]; *id.* at p. 29 ["neither the particular place of use, the character of the use, nor the place of taking is a necessary factor" in acquiring right]; *Barstow*, *supra*, 23 Cal.4th at p. 1244 ["In California surplus water may rightfully be appropriated on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed"]; *Orange County Water Dist. v. City of Riverside* (1959) 173 Cal.App.2d 137, 194-195 [appropriator " 'may at his discretion alienate his right as such' "]; *Alpaugh Irr. Dist. v. Kern County* (1952) 113 Cal.App.2d 286, 294 [property tax assessment properly included value both of irrigation district's land and of appropriative rights it exercised by extracting groundwater for export to district; water rights were separately assessable interest because they "did not arise from mere ownership of the lands and were not a part and parcel of it"]; see *id.* at p. 295 [water rights, "[b]eing the product of appropriation and prescription as against the rights of surrounding landowners whose interests they affected . . . [were] not appurtenant to nor a part or parcel of appellant's lands and consequently could not be classified as improvements thereto."].)

["An appropriative right constitutes an interest in realty . . . .  It can therefore appropriately serve as a servient estate to which an easement may be annexed."].)

The applicability of this principle to the question before us presents a question that is far from simple.  In *City and County of San Francisco v. Alameda County* (1936) 5 Cal.2d 243 (*CCSF*), the question was whether a county could continue to collect property taxes on water rights a city in another county had purchased from a water company, which had itself acquired them by purchase or condemnation from riparian owners in the taxing county.  The city asserted that the rights were governed by the general rule exempting public property from taxation.  (Former Cal. Const., art. XIII, § 1, repealed Nov. 5, 1974; see now Cal. Const., art. XIII, § 3.)  The county argued that they fell under a 1914 constitutional amendment permitting the taxation of "lands and . . . improvements" owned by a local public entity outside the taxing county's borders, provided the rights were subject to taxation when the entity acquired them.  (Former Cal. Const., art. XIII, § 1, repealed Nov. 5, 1974; see now Cal. Const., art. XIII, § 11.)  The dispositive question, wrote the court, was "whether the water rights acquired by [the city] by purchase from the . . . [w]ater [c]ompany were included within the term 'land' as used in the constitutional amendment, and, as such, therefore separately assessable in Alameda county."  (*CCSF*, *supra*, at p. 246.)  Relying heavily on the purpose of the amendment (discussed below), the court answered this question in the affirmative.

A similar question was presented in *Waterford Irr. Dist. v. Stanislaus County* (1951) 102 Cal.App.2d 839 (*Waterford*), where a county sought to tax an irrigation district's right to divert water from a river.  As a municipal corporation, the district was protected by the exemption noted above except insofar as the right fell within the exception for lands and improvements outside its borders.  The district contended that "the water right, being an appropriative right and not riparian to nor appurtenant to any land, does not constitute land nor improvement on land within the meaning of those terms

20

as used in the constitutional provisions." (*Id.*, at p. 842.) The court agreed that the origin of the rights at issue distinguished *CCSF*, the holding in which "was primarily based upon the stipulated fact that the water rights there taxed were riparian in origin; and the holding that they were embraced within the meaning of the word 'land' as used in the Constitution was arrived at by considering the original nature of those rights as having been part and parcel of the riparian lands." (*Id.* at p. 843-844.) It concluded, however, that despite this distinction, the rights before it also remained taxable. It quoted at length from a treatise declaring that appropriative water rights are themselves a species of real property: " 'A water-right of appropriation is real estate, independent of the ditch for carrying the water, and independent of ownership or possession of any land and independent of place of use or mode of enjoyment, whereby the appropriator is granted by the government the exclusive use of the water anywhere so long as he applies it to any beneficial purpose . . . .' " (*Id.*, at p. 844, quoting 1 Wiel, Water Rights in the Western States (3d ed. 1911), § 288, p. 304.) The same author cited authorities holding that " 'The right to the flow and use of water, being a right in a natural resource, is real estate. [Citation.] . . . The statute of frauds, concerning conveyances of real estate, applies to it, and transfers must be by deed. [Citations.] The statute of limitations concerning land applies to it. [Citation.] So do the recording statutes, as between successive conveyances. [Citations.] The right to have water flow from a river into a ditch is real property. [Citation.] . . . The right to take water from a river and conduct it to a tract of land is realty. [Citation.] The right to have water flow through a pipe from a reservoir to and upon a tract of land is an appurtenance to the land. [Citation.] An undivided interest in a ditch and in the right to water flowing therein is real property. [Citation.] And where one person has a right to the flow of water and another has the right to have a part of such water flow to his land for its irrigation, the right of the latter is real property. [Citations.] Ditches and water-rights may be sold on execution as real property.

21

[Citation.] . . . And an action to settle rights is one to quiet title to realty. [Citation.] . . . . [¶] That the usufructuary right to the flow and use of a natural stream by appropriation is real property is fully recognized . . . . ' " (*Waterford*, *supra*, at pp. 844-845, quoting 1 Wiel, *supra*, § 283, pp. 298-300.) The author had further declared that " '[a] water-right by appropriation is not only real estate, but has all the dignity of and is an estate of fee simple, or a freehold.' " (*Waterford*, *supra*, at p. 845, quoting 1 Wiel, *supra*, § 285, p. 301.) The court explained that these passages were presented not as dispositive in themselves, but as evidence of "the common concept as to the nature of appropriative water rights" when the 1914 amendment was adopted. (*Waterford*, *supra*, at p. 845.)

These cases suggest that the rights burdened by a groundwater extraction charge are themselves a species of real property, whether or not the charge is "incidental" to the ownership of any overlying or other property. Because the parties had not addressed the applicability of these decisions, we asked them to do so. The District pointed out quite correctly that neither *Waterford* nor *CCSF* rested solely or even primarily on the technical niceties of property law; both courts cited the policy objectives that apparently led voters to adopt the 1914 constitutional amendment limiting the exemption of public property from taxation. In *CCSF* the court noted that the "undoubted purpose of the amendment was primarily to safeguard the tax revenues of smaller counties wherein large municipal corporations had purchased, or would acquire, extensive holdings and which would, except for the amendment, be exempt from local taxation." (*CCSF*, *supra*, 5 Cal.2d at pp. 245-246.) Without such a limitation, the exemption of public property from taxation could result in "serious financial embarrassment" for the disadvantaged counties. (*Id.* at p. 246.) The argument made to voters when they adopted the amendment had forecast "impending disaster" to "smaller counties" from the loss of revenue caused by larger counties' acquisition of "lands and water rights" to augment the cities' municipal

22

water supplies.[11]  (*Ibid*.)  In the situation before it, the water rights at issue had been, prior to their acquisition from riparian owners, "part [and parcel] of the land itself" and had significantly enhanced its taxable value.  (*Id.* at p. 247.)  Once stripped of those rights, "the valuation of the land for purposes of taxation was or might be materially reduced."  (*Ibid*.)  Therefore, "taking into consideration the objects and purposes of the constitutional amendment," the rights must "be deemed to retain those characteristics [they possessed] when owned by the plaintiff's predecessor in interest," so as to be subject to taxation.  (*Ibid*.)

In *Waterford*, as we have noted, the court acknowledged the historical differences between the appropriative rights before it and the rights, originally riparian, at issue in *CCSF*.  However, after reviewing the above treatise and other cases discussing the policy of the amendment, the court reached the same result as in *CCSF*:  "[B]earing in mind the purposes of the amendment and what we believe to be the common concept of the nature of appropriative water rights, we conclude that they constitute land, as that term is used in the Constitution."  (*Waterford, supra,* 102 Cal.App.2d at p. 847.)

Here too the technical status of appropriative rights would seem to invite a simple answer to the question whether the constitutional provision before us applies:  Since an appropriative water right is itself real property, the charge in question directly burdens the exercise of that right, and the charge must therefore be deemed to be "imposed . . . upon" Great Oaks "as an incident of property ownership."  (Art. 13D, § 2, subd. (e).)  For the same reasons as in *Waterford* and *CCSF*, however, the applicability of Article 13D to the charge before us cannot depend entirely or even primarily on the technical nature of the

---

[11]  The court acknowledged that the amendment would sometimes operate outside this big-vs.-small paradigm, but found that effect to be "but an incident [that] cannot disturb the manifest and general operation of the amendment."  (*CCSF, supra,* 5 Cal.App.2d at p. 246.)

burdened right.  The ultimate question is not how legal scholars might view the rights in question, but whether the voters intended to extend Article 13D's reach to such a charge.  As in the foregoing cases, this question must be answered by consulting other evidence of the voters' intent.

In contrast to the constitutional provision at issue in *CCSF* and *Waterford*, Article 13D does not appear to address a narrowly conceived problem.  Nor can a readily cabined intention be drawn from the materials before the voters when they adopted it.  According to the Legislative Analyst's "Overview" of the enactment, its chief effects would be to "[r]educe the amount of fees, assessments, and taxes that individuals and businesses pay," and "[d]ecrease spending for local public services." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996), analysis of Prop. 218 by Legis. Analyst, p. 73.)  Assuming these to be the intended purposes of the enactment, they provide far too vague a guide to determine what exactions were intended to fall within its restrictions.  The Legislative Analyst suggested a somewhat more concrete guideline by describing affected "[f]ees" as charges assessed by local governments for "services to their residents," some of which are assessed to "pay for service to property, such as garbage collection and sewer service." (*Ibid*.)  The targeted fees were described as "usually" reflected in "monthly bills to property owners," although "some fees are placed on the property tax bill." (*Ibid*.)

The argument in favor of the proposition could be understood to attribute a relatively narrow scope to the measure's operation.  It opened with a statement that the proposition "guarantees your right to vote on local tax increases—even when they are called something else, like 'assessments' or 'fees' imposed on landowners." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996), argument in favor of Prop. 218, p. 76.)  It alluded repeatedly to the desirability of requiring voter approval to "raise taxes," and to some assessments and fees as a euphemism for new or increased taxes. (See *ibid*. ["politicians

24

created a loophole in the law that allows them to raise taxes without voter approval by calling taxes 'assessments' and 'fees.' "].)  While the argument appeared largely devoted to assessments—and indeed, failed to distinguish in any coherent way between an assessment and, say, a monthly charge for water delivery—it consistently characterized all offending exactions as, in reality, "tax increases."  (*Ibid*.)  It may, however, have reflected an intent to reach monthly charges for services when it asserted that "[n]on-voted taxes on electricity, gas, water, and telephone services hit renters and homeowners hard."  (*Ibid*.)  It then appeared to return to the theme of assessments by stating, "To confirm the impact of fees and assessments on you, look at your property tax bill."  (*Ibid*.)

This background hardly provides the overall guidance the courts were able to draw from the circumstances surrounding the provision at issue in *CCSF* and *Waterford*.  As potentially applicable here, however, the voter pamphlet provides strong evidence that the voters expected, and thus intended, that the article would reach charges for water service.  The Legislative Analyst opined that the measure would "probably" apply to "[f]ees for water . . . service."  (Ballot Pamp., Gen. Elec. (Nov. 5, 1996), analysis of Prop. 218 by Legis. Analyst, p. 73.)  Most critically, the text of the article itself seems to leave little doubt that the drafters viewed charges for water service as property-related fees.  This at any rate is the seemingly compelling implication arising from the reference to "fees or charges for sewer, water, and refuse collection services" in Article 13D, § 6, subdivision (c), which exempts these kinds of charges from the voter ratification requirement to which all other property-related charges are subject.  There would of course be no need to exempt these charges from that requirement unless it were expected that they would be viewed as "property related fee[s] or charge[s]."  (*Ibid*.)  It follows that if the charge here is for "water service," it is indeed a property-related charge subject to Article 13D, though exempt from the voter ratification requirement.

25

### D. Water Service

That the charge is one for water service follows directly from our decision in *Griffith*, *supra*, 220 Cal.App.4th 586, 595. It was undisputed there that the charge at issue—the 2010 version of the groundwater augmentation charge we considered in *Amrhein*, *supra*, 150 Cal.App.4th 1364—was property-related. The defendant district had implicitly conceded as much by seeking to comply with Article 13D's requirement of advance notice and a public hearing on the charge. (*Griffith*, *supra*, 220 Cal.App.4th at p. 593; see Art. 13D, § 6, subd. (a).) The charge was nonetheless challenged on the ground that the District should also have complied with the voter ratification requirement of Article 13D, section 6, subdivision (c). We observed that this argument "necessarily fail[ed] if the augmentation charge f[ell] within the express exemption" from the ratification requirement "for sewer, water, and refuse collection services." (*Griffith*, *supra*, at p. 594.) We concluded that the charge was imposed "for water service within the meaning of Proposition 218," and as such, was "expressly exempt from the fee/charge voting requirement." (*Id.* at p. 596.)

This conclusion was presaged by our decision in *Amrhein*, which in turn rested on the Supreme Court's reasoning in *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205 (*Bighorn*), and *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409. In those cases the Supreme Court concluded, as relevant here, that the direct delivery of water to users was a property-related service such that charges for such delivery must comply with Article 13D. In *Amrhein* we essentially concluded that the groundwater augmentation charge there was conceptually indistinguishable, for purposes of property-relatedness, from the charges in those two cases.

In *Griffith* we took the further step of acknowledging that the *indirect* delivery of water to groundwater extractors—whether by replenishment of the groundwater basin, or by measures reducing demands on it—was conceptually indistinguishable from the direct

26

delivery of water.  The challengers there sought to distinguish between groundwater management services and "water service" as contemplated in Article 13D.  Describing this as a "distinction without a difference," we said, "Domestic water delivery through a pipeline is a property-related water service within the meaning of Proposition 218. (*Bighorn*[, *supra*,] 39 Cal.4th 205, 217, 46 Cal.Rptr.3d 73, 138 P.3d 220.)  And we have held that, for purposes of Proposition 218, the augmentation charge at issue here does not differ materially 'from a charge on delivered water.'  (*Amrhein*, *supra*, 150 Cal.App.4th at pp. 1388–1389, 59 Cal.Rptr.3d 484.)  If the charges for water delivery and water extraction are akin, then the services behind the charges are akin.  Moreover, the Legislature has endorsed the view that water service means more than just supplying water.  The Proposition 218 Omnibus Implementation Act, enacted specifically to construe Proposition 218, defines 'water' as 'any system of public improvements intended to provide for the production, storage, supply, treatment, or distribution of water.'  (Gov.Code, § 53750, subd. (m).)  Thus, the entity who produces, stores, supplies, treats, or distributes water necessarily provides water service.  Defendant's statutory mandate to purchase, capture, store, and distribute supplemental water therefore describes water service." (*Griffith*, *supra*, 220 Cal.App.4th at p. 595.)

Great Oaks argues that the charge cannot be viewed as one for water service because it "is not based at all on the delivery of water, but is instead based solely upon the 'production' or extraction of groundwater for beneficial use."  It is true that the charge is *occasioned and measured* by the pumping of groundwater.  This fact might be critical if the water service exemption were defined in terms of a charge *on* specified *activities*.  But it instead applies to "fees or charges *for* sewer, water, and refuse collection *services*."  The question is thus not what triggers a charge, or what activity it directly burdens, but what it is "for," i.e., where the proceeds go.

27

Here the District Act states that the charge is levied upon extraction facilities within affected zones "for the benefit of all who rely directly or indirectly upon the ground water supplies of such zone or zones and water imported into such zone or zones." (District Act, § 26.3)  It then declares that the proceeds of the charge shall be used for importing, treating, and distributing water, as well as replenishing the groundwater basin. (District Act, § 26.3)  We see no material distinction between these purposes and the purposes that, as we held in *Griffith*, made the charge in that case one for water service.  Accordingly, the charge was generally subject to Article 13D, but was exempt from the requirement of voter ratification.  To the extent the trial court's finding of a violation of Article 13D rested on the absence of such ratification, it was error.

### E.  Regulatory Purpose

The District suggests that even if the extraction charge is property-related, it falls outside the contemplation of Article 13D because it serves a regulatory purpose.  This suggestion appears to be based on a passage in *Amrhein*, where we wrote, "The juxtaposition of [*Apartment Association*, *supra*, 24 Cal.4th 830] with *Bighorn*[, *supra*, 39 Cal.4th 205]  suggests the possibility that a fee falls outside Article 13D to the extent it is charged for consumption of a public service for purposes or in quantities exceeding what is required for basic (i.e., residential) use of the property.  In *Richmond* and *Bighorn* the court was clearly concerned only with charges for water for 'domestic' use. [Citation.]  This leaves open the possibility that delivery of water for *irrigation* or other nonresidential purposes is not a property-based service, and that charges for it are not incidental to the ownership of property.  *A finding that such a fee is not imposed as an incident of property ownership might be further supported by a clearly established regulatory purpose, e.g., to internalize the costs of the burdened activity or to conserve a supplied resource by structuring the fee in a manner intended to deter waste and*

28

*encourage efficiency.*" (*Amrhein*, *supra*, 150 Cal.App.4th at p. 1389-1390, fn. omitted, second italics added.) The charge at issue here, asserts the District, is just such a fee.

The possibility we meant to hold open in *Amrhein* is that Article 13D might not be intended to foreclose the imposition of fees—or perhaps more precisely their structuring—in such a way as to regulate, through market forces, the consumption or use of a scarce or protected commodity or service. The quoted passage contemplated a hypothetical fee that was "structur[ed]" in such a way as to operate in this manner. The most obvious example would be a fee that scales up as consumption of the public service increases, or is triggered only after a certain threshold quantity has been taken. While we do not mean to suggest that this is the only way a fee might fall within our hypothetical "regulatory" rubric, we did indicate that any such regulatory purpose would have to be "clearly established."

The underlying rationale for such an exception would be that Article 13D is intended to regulate exactions that operate as de facto taxes, i.e., to *produce revenue*, in circumvention of the restrictions on taxation imposed by other initiatives. (See Ballot Pamp., Gen. Elec. (Nov. 5, 1996), argument in favor of Prop. 218, p. 76 ["After voters passed Proposition 13, politicians created a loophole in the law that allows them to raise taxes without voter approval by calling taxes 'assessments' and 'fees.' "]; *id*., rebuttal to argument against Prop. 218 ["Proposition 218 simply gives taxpayers the right to vote on taxes and stops politicians' end runs around Proposition 13."].) We sought only to acknowledge the possibility that a fee could be argued to fall outside this purpose, and thus outside the restrictions imposed by Article 13D, if it were designed predominantly not to secure revenues but to directly regulate the burdened activity—in essence, to deter excessive consumption—through price signals.

The District directs us to nothing in the record that would compel or even permit a finding that the extraction fee here falls within the "regulatory purpose" hypothesis we

29

posited in *Amrhein*. While the fee as a whole may be intended in part to influence the consumption of groundwater, it is not "structured" in the sense contemplated above. Nor does anything in the District Act "clearly establish[]" that it has a regulatory purpose. Nothing in the notice to owners explaining the basis for the fee alluded to any such objective. The trial court expressly found that the charge "does not serve a significant regulatory purpose." We detect no error in that finding.

### F. *Notice and Hearing*

#### 1. Background

Article 13D requires an agency proposing to impose or increase a property-related charge to "provide written notice by mail of the proposed fee or charge to the record owner of each . . . parcel upon which the fee or charge is proposed for imposition." (Art. 13D, § 6., subd. (a)(1).) The notice must set forth "the amount of the fee or charge proposed to be imposed upon each [parcel], the basis upon which the amount of the proposed fee or charge was calculated, the reason for the fee or charge, together with the date, time, and location of a public hearing on the proposed fee or charge." (*Ibid*.) The notice must be given at least 45 days before the hearing. (*Id*., § 6, subd. (a)(2).) At the hearing, "the agency shall consider all protests against the [written] fee or charge. If written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge." (*Ibid*.)

The trial court found that the District "fail[ed] to comply with proper notice requirements" under Article 13D. It did not specify in what way the District's procedures were deficient. We detect no such deficiency.

The undisputed facts are these: On or about March 1, 2005, the District mailed a "notice of hearings on groundwater charges for 2005-2006" to about 4,500 well owners in the county. One version of the notice concerned "Zone W-2 (North County)," while the other concerned "Zone W-5 (South County)." The Zone W-2 notice set out

30

"minimum" and "maximum" proposed rates, per acre foot, of $40.50 and $43.50 for agricultural use, and $405.00 and $435.00 for other uses. The corresponding numbers for zone W-5 were $20.00, $24.00, $200.00, and $240.00. The notice invoked the District's authority to levy the charge and stated that it would be used to "fund the District's activities to protect and augment water supplies for the public health, welfare and safety of the community." The notice specified that the charge would be used to "[p]ay the costs of importing water to recharge the groundwater basin," to "[o]perate and maintain the pipelines and pumping plants that distribute imported water throughout our service area," to "[o]perate and maintain the District's reservoirs and recharge ponds which help replenish the groundwater basin," to "[p]lan and construct improvements to pipelines and reservoirs," to "[c]onduct groundwater protection programs such as the district's Well Ordinance program, and programs to detect and protect groundwater from perchlorate, nitrate and other contaminants," to "[o]ffer water-efficiency programs, such as the Mobile Lab and Irrigation Technical Assistance programs, toilet rebates and free household water audits," and to "[d]evelop recycled water to boost water supply reliability and conduct special studies to research the feasibility of using advanced treatment of recycled water to improve quality[.]"

The notice for Zone W-5 stated that public hearings on the proposed rates would take place on April 1 and 19 in San Jose, and on April 11 in Morgan Hill. The notice for Zone W-2 referred only to the April 1 and 19 dates. The chief executive officer for Great Oaks declared below that the District did not disclose a fixed proposed rate until March 22, 2005, when it made available for public inspection a report apparently specifying the agricultural and non-agricultural rates ultimately adopted, i.e., $42.00/$420.00 for Zone W-2, and $21.50/$215.00 for Zone W-5.[12] He declared that "different proposed rates

---

[12] Deficiencies in the record and the briefs compel us to rely on the cited averment, rather than any primary document. Apparently the fixed rate, as ultimately adopted, would have been set out in a 2005 "Preliminary Water Utility Enterprise

31

were discussed at the hearing, but the actual rate was not imposed until after the hearing was closed to the public." On April 19, the board of directors for the District adopted Resolution No. 05-28, setting the charge at the rates as fixed on March 22.

## 2. Timeliness of Notice

In finding that the District's procedures did not comply with Article 13D's notice-and-hearing requirements, the trial court presumably adopted all or some of Great Oaks's arguments on that subject. Great Oaks asserted in its trial brief that the March 1 notices were deficient for failure to "(1) set forth the amount of the fee or charge proposed to be charged (versus providing a range of possible rates), (2) set forth the basis upon which the amount of the proposed fee or charge was calculated, or (3) set forth a mechanism to protest the fee." On appeal Great Oaks also asserts that the District violated Article 13D by having two hearings less than 45 days after the March 1 notice—even though the last scheduled hearing was more than 45 days after that date, and the charge was not adopted until that hearing had concluded. None of these contentions identifies a fatal defect in the District's notice.

Nothing in Article 13D prohibits a public agency from conducting public hearings within the 45 days following notice of a proposed increase in a charge or fee, provided it conducts at least one noticed hearing at least 45 days after the notice. The operative provisions state that the agency shall "(1) . . . provide written notice by mail of the proposed fee or charge . . . together with the date, time, and location of a public hearing on the proposed fee or charge," and "(2) . . . conduct a public hearing upon the proposed fee or charge not less than 45 days after mailing the notice . . . ." (Art. 13D, § 6, subd. (a).) At the hearing, the agency shall "consider all protests against the proposed fee

Report," which was apparently made public on March 22 of that year. Neither party has cited this seemingly critical document. Indeed, as far as we can tell, it is absent from the record. Instead our search of the 55-volume appendix has discovered a later, "final" version of that report, as well as similar reports from three other years.

or charge," and if written protests are received from a majority of owners, "shall not impose the fee or charge." (*Id.*, § 6, subd. (a)(2).) Nothing in this language prohibits the agency from giving notice of, and conducting, additional hearings. Great Oaks's suggestion to the contrary is put forth only obliquely, with no argument or authority offered in its support.

The District gave timely notice of the hearing preceding imposition of the charge, as contemplated by the above provisions of Article 13D.

### 3. Notice of Proposed Charge

Great Oaks suggests that the March 1 notice was defective because it set forth a range of possible rates instead of a single, fixed proposed rate. Again the underlying premise—that a range of rates offends Article 13D—is never straightforwardly advocated, but is simply put forth by necessary implication. We reject it.

Article 13D requires that the agency give "written notice by mail of the proposed fee or charge." (Art. 13D, § 6, subd. (a)(1).) To the extent any argument on this point can be inferred from Great Oaks's brief, it appears to rest entirely on Article 13D's requirement that the notice set forth "*the* proposed fee or charge." (*Ibid.*) This use of the singular article can hardly be understood to preclude a notice stating a range of possible charges. Such a notice states in effect that the agency "propose[s]" to impose "the" *maximum* rate set forth, while reserving the option to select a lower rate. The disclosure of such an intention does not offend the letter of the cited requirement. Nor does it offend its purpose, which it to ensure that owners are notified of the financial burdens to which a proposed charge may expose them, so that they can decide whether to oppose it. This function is fully served by disclosing the maximum financial burden contemplated by the propounding agency. Should the agency elect to impose a lower rate than the one specified in the notice, no harm is done to the owners or to the constitutional requirement, and no ground appears to question the validity of the charge. (See *Morgan v. Imperial*

33

*Irrigation Dist., supra,* 223 Cal.App.4th 892, 902, 922-923 [water agency did not violate Article 13D by adopting rates below those specified in notice of hearing].) This conclusion is not altered by an agency's expressly reserving the option of imposing a lower rate, or by specifying a *minimum* rate as well as a maximum one. In either case the notice merely imparts the further information that the burden ultimately imposed may be less onerous than the maximum expressed in the notice.

Any owner who objects to a charge above a given level is free to lodge an objection to that effect, and if a majority of owners do so they can effectively set a ceiling on the charge. By objecting to the *minimum* stated, they can effectively prevent the imposition of *any* charge. In no way is the purpose of the provision subverted by a notice such as was given here.

In so viewing this requirement we are apparently joined by the Legislature, which has expressly authorized an agency, when voter ratification of a charge is required, to "state a range of rates or amounts," and upon ratification, to impose any charge within the specified range. (Gov. Code, § 53739, subd. (a).) We can think of no reason that a more stringent rule should govern the notice mandated by Article 13D, section 6, subdivision (a)(1).

We conclude that the notice mailed on March 1 adequately notified owners of the "proposed fee or charge."

### 4. Basis of Calculation

Great Oaks also faulted the March 1 notice for failing to "set forth the basis upon which the amount of the proposed fee or charge was calculated." It made no attempt to elaborate upon or otherwise substantiate this objection in its trial brief, and in its brief here it merely alludes to the language of Article 13D while citing our summary of the article's requirements in *Amrhein*, *supra*, 150 Cal.App.4th at page 1385.

34

Article 13D contemplates that an agency giving notice of a proposed charge will, after identifying the parcels subject to the charge, "calculate[]" the "amount of the fee or charge proposed to be imposed upon each parcel." (Art. 13D, § 6, subd. (a)(1).) Having done so, the agency is to give notice to each parcel's owner of "the proposed fee or charge . . . the amount of the fee or charge proposed to be imposed upon each, *the basis upon which the amount of the proposed fee or charge was calculated*, the reason for the fee or charge, together with the date, time, and location of a public hearing on the proposed fee or charge." (*Ibid*., italics added.)

The requirement that the agency disclose the "basis" for the charge is thus tied directly to the specific "amount" to be charged to each parcel or owner, and is separate from the requirement that the agency disclose the "reason" for the charge. The underlying conception of a single charge against an identified parcel is of course underinclusive, since the fees and charges covered by the article are not limited to such assessments but extend to consumption-based charges like the one before us. Nonetheless the manifest intent of requiring the agency to disclose the "basis" for the charge is to include in the notice the *method of calculation*, meaning the unit by which, and the rate at which, the charge is determined. Thus a notice might state that the rate is $2.00 per foot of street frontage, that the addressee's parcel has 50 feet of street frontage, and that the amount of the charge on that parcel is thus $100.00. (See, e.g., *Dahms v. Downtown Pomona Prop.* (2009) 174 Cal.App.4th 708, 713 [assessment for new business improvement district was based on weighted combination of street frontage, building size, and lot size, from which each parcel's assessment was calculated "as a portion of the total cost of the services" to be provided].) This enables the owner to ascertain, among other things, that the relevant characteristics of the parcel have been accurately measured by the agency.

35

When a charge depends in part on an unknowable variable such as consumption, all the agency can reasonably be expected to provide in a notice of the proposed charge are the known variables, i.e., the rate and the unit of measure. The amount actually due will consist of the the rate times the units the addressee ultimately consumes. Here, by disclosing the rate and the unit of measure, the District disclosed all that possibly could be disclosed of the "basis upon which the amount of the proposed fee or charge [would be] calculated." (Art. 13D, § 6., subd. (a)(1).) Nothing in Great Oaks's presentation on this point suggests that this did not satisfy the letter and purpose of the cited provision.

### 5. Mechanism to Protest Fee

Great Oaks also suggested below that the District's procedures were defective for failure to "set forth a mechanism to protest the fee." This seems to hint at two distinct concepts: failure to *notify owners* of their power to nullify the proposed fee by majority protest; and failure to provide an *adequate procedure* for lodging objections toward that end.

Again Great Oaks failed to marshal any coherent argument in support of the implicit premise, i.e., that the District was under a duty to explicitly notify owners of their collective power to nullify the charge by objecting to it in writing. The relevant argument in Great Oaks's brief consists entirely of a statement that "at no time did the District notify property owners they had the right to protest the groundwater charge, or provide majority protest procedures, *as required by Article XIIID, Section 6(a)(2).*" (Italics added.) Nothing in the cited provision requires an agency either to notify owners of their rights in this regard, or to "provide majority protest procedures" to facilitate their doing so. Rather the relevant provision states that the agency shall conduct a hearing at which it is to "consider all protests against the proposed fee or charge. If written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge." (Art. 13D, § 6, subd. (a)(2).)

36

Had the voters wished in 1996 to require express notification to owners of their nullification rights, or to prescribe a mechanism for the exercise of those rights, they were more than capable of doing so, as they demonstrated in the parallel provisions governing assessments. There they provided that the notice of a proposed assessment shall include (1) a ballot in prescribed form (Art. 13D, § 4, subd. (d)), and (2) "a summary of the procedures applicable to the completion, return, and tabulation of the ballots . . . , including a disclosure statement [*sic*] that the existence of a majority protest, as defined in subdivision (e), will result in the assessment not being imposed" (*id*., subd. (c)). In the Omnibus Proposition 218 Implementation Act, the Legislature adopted elaborate procedures for carrying out these provisions, including means of notice, protest, and balloting.[13] (Gov. Code, § 53753.)

These provisions, however, are expressly limited to assessments. Neither the voters nor the Legislature saw fit to impose similar requirements with respect to the adoption of property-related fees and charges. This disparity in treatment can be readily explained by the fact that, as a class, property-related fees and charges are farther removed than assessments from the avowed purpose of Article 13D, which is to prevent de facto tax increases in the guise of other exactions. Further, in contrast to assessments, such fees are usually not imposed unconditionally but typically depend on, and are calibrated according to, the payer's use of some provided service. The voters and legislators could quite reasonably have feared the potential fiscal and administrative consequences if every increase in a service-related fee subjected the agency to the burden and expense of the full-blown balloting procedure prescribed for assessments.

---

[13] Most pertinently, the notice of hearing on the assessment must enclose a ballot (Gov. Code, § 53753, subd. (c)), and must include "a statement that the assessment shall not be imposed if the ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment, with ballots weighted according to the proportional financial obligation of the affected property" (*id*., subd. (b)).

37

Given the seemingly deliberate difference between the procedures required for assessments and those imposed on property-related fees and charges, we cannot insert terms into the latter provisions based upon a mere surmise that voters failed to say what they meant. We are particularly loath to adopt such an approach where its effect is to impose unwritten procedural requirements on public agencies, increasing their administrative overhead and ultimately either reducing the services delivered by them, or increasing the fiscal burden on the public. (See *Morgan v. Imperial Irrigation Dist., supra,* 223 Cal.App.4th 892, 920-922 [failure to disclose protestors' identifications did not offend requirement of public hearing, where nothing in Article 13D, § 6(a)(2), required disclosure].) If the provisions of Article 13D are indeed deficient in this regard, the remedy lies at the polls or in the Legislature.

We have no doubt that an agency imposing a property-related charge must afford a fair and reasonable opportunity for owners to express their opposition and, most importantly, to lodge their written objections. But there is no suggestion that the District's procedures fell short of that standard. The record fails to establish the precise manner in which any of the public hearings were conducted, but that failure appears to be the result of the parties' agreement to try this case without apparent regard for the procedures usually employed in challenges to administrative rulings—which require, among other things, the creation of an administrative record. (See pt. II(B), *post*.) All Article 13D required, however, was that District conduct a hearing, on proper notice, at which it would hear and receive owners' objections. That it conducted a hearing is undisputed. Great Oaks has never so much as asserted that the District did not afford due opportunity to object. Great Oaks asserted in its trial brief that the District had adopted the charge "[a]fter the public meeting was closed." Assuming this is true, it has no

38

tendency to show that owners were afforded insufficient opportunity to be heard or to lodge objections to the charge.[14]

No deficiency appears in the notice and hearing procedures employed by the District. Accordingly, the trial court erred by finding that the District had "fail[ed] to comply with proper notice requirements."

### G. Substantive Compliance

Article 13D, section 6, subdivision (b), imposes several substantive limitations on property-related fees and charges. In its trial brief Great Oaks argued that the groundwater extraction charge violated three of these limitations. The trial court did not address these contentions. Nor does Great Oaks offer them as alternative grounds to affirm the judgment. Accordingly we make no attempt to address them here. As discussed in the following sub-part, however, these contentions may be revisited upon remand.

### H. Sufficiency of Pre-Suit Claim

#### 1. Background

The District contends that even if the trial court had properly found a violation of Article 13D, it was precluded from awarding monetary relief on that basis because no such claim was ever communicated to the District by a pre-suit claim. We might seem to have mooted this contention by concluding, as we do in parts I(D) and I(F), *ante*, that the District did not violate the procedural requirements of Article 13D. However, our

---

**14** Nothing in this record indicates that Great Oaks or any other owner notified the District of any claim that its procedures might violate Article 13D in this or any other respect. There is much to be said for a requirement that any purely procedural objection to a charge of this kind be brought to the agency's attention *before* it is too late for the agency to cure it. To invalidate such a fee after the fact in favor of one objecting party effectively deflects the costs to other payers of the fee, past and future. As discussed below (pt. I(H)), the first notice the District received of any claimed deficiency under Article 13D apparently came in the form of Great Oaks's complaint in this matter.

39

unqualified reversal of the judgment will set the matter " 'at large' " in the trial court, opening the possibility of a retrial or other further proceedings. (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 869, p. 928; see *id*., § 870, p. 929.) At that time it may be open to Great Oaks to attempt to bolster its claims of procedural deficiency—at least in the notice and hearing aspects of the District proceedings. Moreover the trial court never reached Great Oaks's claims that the groundwater charge failed to satisfy the *substantive* limitations imposed by Article 13D on local fees and charges. Since either of these theories is sure to be met by a renewal of the District's assertion of deficiencies in the pre-claim notice, we deem it expedient to resolve so much of that question as may be determined on the present record.

Insofar as the claimed violation of Article 13D concerns the District's notice and hearing procedures, monetary relief is indeed foreclosed by the failure to hint at any such cause of action or theory of relief in the pre-suit claim. It is undisputed that any monetary claims Great Oaks might pursue against the District were subject to the requirements of the Government Claims Act (Gov. Code, §§ 900 et seq.) (GCA). (See District Act, § 30 [requiring any claim against District for "money or damages" to comply with the GCA].) Among the GCA's key provisions is the requirement that, with stated exceptions, "all claims for money or damages against local public entities" must be presented in accordance with its terms.[15] (Gov. Code, § 905.) Government Code section 945.4 provides that "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim

---

[15] None of the exceptions has been invoked here. The most nearly applicable appears to be for "[c]laims under the Revenue and Taxation Code or other statute prescribing procedures for the refund, rebate, exemption, cancellation, amendment, modification, or adjustment of any tax, assessment, fee, or charge or any portion thereof, or of any penalties, costs, or charges related thereto." (Gov. Code, § 905, subd. (a).) It has not been suggested here that any statute "prescribe[es] procedures" for Great Oaks's monetary claims against the District.

therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board . . . ."

Great Oaks submitted a claim to the District on May 20, 2005.  However its sole stated grounds for recovery were that the District was *violating the District Act* in fixing the groundwater charge, which it called a "pump tax," and in spending the proceeds thereof.  Great Oaks alleged that the District was "illegally using pump tax revenues for purposes outside the four (4) statutorily specified uses," that "to cover those unauthorized expenditures the amount of the pump tax is excessive," and conversely, that it had "charged and continues to charge an excessive pump tax and that those excessive pump tax revenues are used for purposes which are not expressly authorized by the Act."  The claim further asserted that the District had "damaged Great Oaks by requiring it to pay more than necessary for the pump tax.  Consequently, [District] is indebted to Great Oaks for *the amount it charged over and above what was necessary* to fulfill the statutorily listed uses for pump tax revenues.  Great Oaks hereby makes a claim for the refund of *the amount which it was overcharged* for the pump tax and requests that the [District] lower the pump tax and modify its uses of pump tax revenues to come into conformity with the Act." (All italics added.)

The claim made no mention of the provisions of Article 13D.  Nor did it refer to the notice of the proposed charge, the hearing on that subject, or any other procedural aspect of the matter.  Further, there was no suggestion that Great Oaks claimed a right to a *complete refund* of the groundwater charge, as distinct from recovery of the amount by which it was "overcharged."

### 2. Procedural Noncompliance

The claim submitted by Great Oaks cannot sustain an award of monetary relief based on defects in the procedure by which the charge was imposed.

41

"The purpose of [the claims] statutes is 'to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.' [Citation.] Consequently, a claim need not contain the detail and specificity required of a pleading, but need only 'fairly describe what [the] entity is alleged to have done.' [Citations.] As the purpose of the claim is to give the government entity notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions [citation], the claims statute 'should not be applied to snare the unwary where its purpose has been satisfied' [citation]." (*Stockett v. Association of California Water Agencies Joint Powers Ins. Authority* (2004) 34 Cal.4th 441, 446 (*Stockett*).)

At the same time, where a claimant seeks to pursue multiple causes of action resting on distinct facts, it is not enough that some of them were presaged in a pre-suit claim. "If a plaintiff relies on more than one theory of recovery against the State, each cause of action must have been reflected in a timely claim." (*Nelson v. State of California* (1982) 139 Cal.App.3d 72, 79.) "[S]ection 945.4 requires each cause of action to be presented by a claim complying with section 910 . . . . [T]he facts underlying each cause of action in the complaint must have been fairly reflected in a timely claim. [Citation.] '. . . [T]he complaint is vulnerable to a demurrer if it alleges a factual basis for recovery which is not fairly reflected in the written claim.' [Citation.] [¶] The claim, however, need not specify each particular act or omission later proven to have caused the injury. [Citation.] A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an 'entirely different set of facts.' [Citation.] Only where there has been a 'complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim,' have courts generally found the complaint barred. [Citation.] Where the complaint merely elaborates or adds

42

further detail to a claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint. [Citation.]" (*Stockett*, *supra*, 34 Cal.4th at p. 447.)

Here the trial court's award of damages under Article 13D rests on facts—failure to give adequate notice and hearing, and failure to secure voter ratification—that were not fairly reflected, or even hinted at, in the pre-suit claim. The facts underlying the award were " 'entirely different' " from those asserted in the claim, i.e., spending funds on unauthorized activities and improperly inflating the charge to cover those expenditures. (*Stockett*, *supra*, 34 Cal.4th at p. 447.) This represented a " 'complete shift in allegations,' " seeking to predicate liability on " 'acts or omissions committed at different times [and] by different persons than those described in the claim.' " (*Ibid*.)

Great Oaks asserts that "[b]oth the government claim and the complaint are based upon the same set of facts: the District's improper use of groundwater charge revenues." (Underlining omitted.) This statement is only partly accurate. It is accurate, if vague, as a description of the pre-suit claim; but it is at best an incomplete characterization of the causes of action pursued by Great Oaks under Article 13D in the trial court.[16] Most importantly, it does not at all describe the factual basis on which the trial court grounded its ultimate award of damages under Article 13D. The award rested in part on the allegation, which first appeared in the complaint, that the District had to "submit[] its increases of groundwater charges to a vote of the public." The court also found that the District failed to satisfy Article 13D's requirements concerning notice and hearing—a theory of relief mentioned in neither the claim *nor* the complaint.

---

[16] The matter is complicated by the fact that even the operative *complaint* alludes to only one of the several violations of Article 13D that Great Oaks pressed at trial. Apparently that pleading was superseded in this regard by the trial brief in which Great Oaks articulated these theories, with no apparent objection from the District that they strayed outside the pleadings.

43

The trial court could not properly impose monetary liability on grounds that were wholly unheralded in the pre-suit claim. Such a lacuna between the facts asserted in a claim and those ultimately adopted as grounds for liability "defeats the purpose of the statute, which is to give the public entity the opportunity to evaluate the merit and extent of its liability and determine whether to grant the claim without the expenses of litigation." (*Crow v. State of California* (1990) 222 Cal.App.3d 192, 202.) In the case just cited, a student filed a claim charging a state university with tort liability based on an assault by a fellow student. The court refused to permit him to later assert additional facts as grounds for liability in contract. Based on the claim, the university "might well have concluded it had no liability for injuries in a fracas to one who was either an off-campus student or a mere visitor, while the new facts of a contractual guarantee of safety conceivably might have changed its position." (*Ibid.*)

Here too the District could have concluded that its imposition of the groundwater charge and use of the proceeds complied with the District Act, while the "new facts" of procedures allegedly violating Article 13D "might have changed its position." A claim of the latter type had the potential to *completely invalidate* the challenged fee and require a refund of the entire sum paid by Great Oaks. No such consequence was presaged by the pre-suit claim, which asserted only that the District was indebted to Great Oaks for "the amount which it was overcharged for the pump tax." Recognizing this limitation, the trial court awarded some $1.3 million as "damage[s]" under the District Act, including "the overcharge" and other unspecified elements. Yet on the Article 13D claim the court directed the District to refund the entire $4,623,095.52 paid by Great Oaks during the year the charge was in effect. Nothing in the claim alerted the District that it was exposed to any such liability.

Great Oaks urges us to defer to the trial court's ruling on the sufficiency of the claim because that question was vested in the trial court's discretion. Most of the cases it

44

cites for this proposition concern the entirely distinct question of whether a claimant is entitled to relief from a *failure to file a timely claim*. (See *Powell v. City of Long Beach* (1985) 172 Cal.App.3d 105, 109; *Renteria v. Juvenile Justice, Department of Corrections and Rehabilitation* (2006) 135 Cal.App.4th 903, 910; *Ramariz v. County of Merced* (1987) 194 Cal.App.3d 684, 689; *Hernandez v. Garcetti* (1998) 68 Cal.App.4th 675, 682-683.) Others involve pleading issues of no relevance here. (See *Fall River Joint Unified School Dist. v. Superior Court* (1988) 206 Cal.App.3d 431, 435 [denial of judgment on pleadings as to count asserting new theory of relief was an abuse of discretion remediable by extraordinary writ]; *Donohue v. State of California* (1986) 178 Cal.App.3d 795, 800, 801 [no abuse of discretion in granting judgment on pleadings after earlier objections on same ground were overruled].) Slightly closer to the mark is *In re Shafter-Wasco Irr. Dist. v. Westenberg* (1943) 57 Cal.App.2d 90, 99, which considered whether a claim, though deficient, constituted "substantial compliance" with a statute setting forth requirements for a petition to dissolve an irrigation district. On that subject the court wrote, "The judgment of what is a substantial compliance with the statute is to be exercised in the first instance by the trial court. If the case is one where a requirement of the statute has not been entirely disregarded, its determination of the question of substantial compliance ought to be controlling in the absence of an abuse of discretion." (*Ibid*.)

The concept of substantial compliance, however, has little if any bearing on the question at hand. That concept applies when the question is whether a claim conforms to statutory requirements. No one here suggests that the claim here was *defective*. Rather the question is whether it adequately apprised the District of the grounds on which Great Oaks ultimately sought, and the trial court decided, to impose monetary liability on the District. "[A]ny contention of substantial compliance 'is unavailing where the plaintiff seeks to impose upon the defendant public entity the obligation to defend a lawsuit based

45

upon a set of facts entirely different from those first noticed.  Such an obvious subversion

of the purposes of the claims act, which is intended to give the governmental agency an

opportunity to investigate and evaluate its potential liability, is unsupportable.' " (*Turner*

*v. State of California* (1991) 232 Cal.App.3d 883, 891, quoting *Fall River Joint Unified*

*School Dist. v. Superior Court*, *supra*, 206 Cal.App.3d at pp. 435-436.)

The question is thus one of *variance* between the pre-suit claim and the grounds

for relief ultimately asserted—in this case successfully—at trial.  The leading case on this

subject is probably *Stockett*, *supra*, 34 Cal.4th 441, where the Supreme Court reinstated a

verdict for the plaintiff after the Court of Appeal had reversed it based on a variance

between the assertions in the plaintiff's pre-suit claim and the grounds on which liability

was ultimately imposed.  The claim alleged that the defendant agency had acted on three

improper motives in discharging the plaintiff from employment.  (*Id.* at p. 444.)  The

ensuing complaint, as amended, alleged three motives, two of which differed somewhat

from those stated in the claim.  (*Id.* at pp. 444-445.)  The matter went to the jury on these

theories, resulting in a judgment for the plaintiff, which the Court of Appeal reversed,

holding that the trial court had " 'allowed the Stocketts to present a very different case' "

from the one set out in their pre-suit claim.  (*Id.* at p. 445.)

In challenging this conclusion before the Supreme Court, the plaintiff argued that

he was "not precluded from raising additional reasons at trial for his termination because

he was not required, in order to comply with section 910, to claim more than that [the

defendant's] agents wrongfully terminated him, while giving the basic circumstances of

that occurrence." (*Stockett*, *supra*, 34 Cal. at p. 446.)  The Supreme Court agreed that his

claim had been "sufficient . . . to give [the defendant] notice of all theories of wrongful

termination." (*Ibid*.)  In essence, the court concluded that the variant facts were

subsidiary to the single underlying cause of action for wrongful termination; as such they

were not essential to the presentation of a sufficient claim and a divergence from them in

the pleadings or at trial was not fatal. (See *id.* at p. 447 ["these theories do not represent additional causes of action and hence need not be separately presented"]; *id.* at p. 447, fn. 3 [defendant conceded that plaintiff's "claim of dismissal in violation of public policy constitutes only a single cause of action even though his dismissal allegedly violated several public policies"].) The court contrasted the situation to that in *Fall River Joint Unitified School Dist. v. Superior Court, supra,* 206 Cal.App.3d 431, which held a complaint barred because "the factual divergence between claim and complaint was too great; the complaint alleged liability 'on an entirely different factual basis than what was set forth in the tort claim.' ([*Fall River Joint Unitified School Dist. v. Superior Court*, *supra,*] at p. 435.) Stockett's complaint, in contrast, alleged liability on *the same wrongful act*, his termination, as was stated in his notice of claim." (*Stockett*, *supra*, 34 Cal.4th at p. 448, fn. omitted, italics added.) "In comparing claim and complaint," the court wrote, " 'we are mindful that "[s]o long as the policies of the claims statutes are effectuated, [the statutes] should be given a liberal construction to permit full adjudication on the merits." ' [Citations.] If the claim gives adequate information for the public entity to investigate, additional detail and elaboration in the complaint is permitted." (*Id.* at p. 449.) By notifying the defendant of the acts causing his injury and naming those agents believed to be responsible for them, the plaintiff's claim "provided sufficient information for [the defendant] to investigate and evaluate its merits." (*Ibid.*) A reasonable investigation would not simply consist of dispelling the specific improper reasons for termination identified in the claim but "would have included questioning members of the committee to discover their reasons for terminating Stockett and an evaluation of whether any of the reasons proffered . . . constituted wrongful termination."[17] (*Ibid.*)

---

[17] Counsel for Great Oaks recapitulates some of the principles stated in *Stockett*, but describes them as elaborations on the concept of "substantial compliance." The court

47

Here, nothing in the pre-suit claim notified the District that liability might be predicated on an asserted failure to give notice and conduct a hearing pursuant to Article 13D, or on failure to secure voter ratification. All the claim called upon the District to investigate or consider was the extent to which it might be found to have expended revenues from the charge on activities for which the charge was not authorized under the District Act. Nor did anything apprise it that it might be exposed to a judgment ordering the refund of the entire sum paid by Great Oaks for a year, as opposed to a judgment based on the excess of the charge over the expenses it could properly use the charge to defray. The claim failed entirely to anticipate such an award on such a basis, and therefore could not sustain monetary relief.

Great Oaks observes in passing that the District "presented no evidence in support" of the defense that the pre-suit claim was insufficient to sustain all of the causes of action on which Great Oaks sought damages. The "evidence" relevant to the defense consisted entirely of the pre-suit claim as compared to the pleadings and the grounds of liability asserted by Great Oaks at trial. The District placed the claim before the court at or before the time it submitted its trial brief on Phase I. We are directed to no objection or other suggestion of evidentiary deficiency in the trial court.

Great Oaks also alludes without further elaboration to the absence of evidence that the District "conducted an investigation into Great Oaks' claim, that any investigation was in any way limited by the precise wording of Great Oaks' government claim or that the District was either misled or prejudiced in its investigation with respect to Great Oaks' government claim." Whatever the intended import of this statement, it suggests no basis for affirmance. There is no requirement that an agency demonstrate prejudice in order to assert the inadequacy of a pre-suit claim to sustain all or part of a judgment.

never used that term, but twice referred to the issue at hand as one of "variance." (*Stockett*, *supra*, 34 Cal.4th at pp. 445, 448.)

Even if prejudice were a relevant consideration, it would be absurd to say, in a case like this one, that an agency was not prejudiced "in its investigation" merely because there is no evidence that it conducted an investigation. Contrary to the seeming implication of such a contention, an agency's failure to investigate an omitted ground of relief is fully consistent with the agency's having examined the claim *as submitted*, concluded that it was meritless, and *for that reason* having taken no further action, *including investigation*. It cannot be supposed that the same agency, faced with a more colorable claim, would not have investigated it.

Nor would there be any reason, if prejudice were a relevant consideration, to confine the inquiry to the agency's *investigation* of the claim. The claim requirement is also intended to provide the agency with an opportunity to settle or take other corrective action in response to a claim. (See *Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899, 920; *Shoemaker v. Myers* (1992) 2 Cal.App.4th 1407, 1426.) An agency whose fee or charge is challenged as having been adopted without observing constitutionally prescribed procedures might well conclude that the challenge is well taken, in which case it might seek not only to settle the claim but to reenact the fee in compliance with the previously omitted procedures. It is not for claimants or the courts to speculate about what an agency might or might not have done if presented with a timely claim adequately disclosing colorable grounds for objection. (See *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 642 [district was prejudiced by failure to raise certain objections to plan "prior to its implementation, when the District could have addressed [objector]'s concerns and still made changes"].)

For all these reasons, we conclude that the pre-suit claim is insufficient to sustain monetary relief based upon deficiencies in the procedures utilized in the adoption of the 2005-2006 groundwater extraction fee.

### 3. Substantive Noncompliance

This leaves the question whether the claim submitted by Great Oaks would support a monetary award under Article 13D on the ground that the groundwater charge did not comply with the *substantive* limitations of Article 13D. This theory does not clearly appear in the complaint, but was asserted in Great Oaks's trial brief. It does not appear that the District objected to this theory as outside the pleadings. It therefore appears to have been properly before the trial court. (See 9 Witkin, *supra*, Appeal, §§ 407 pp. 466-468, 410, pp. 469-470.) Judging from its statement of decision, however, the court did not reach this theory—presumably because the court found it unnecessary to do so once it found that the charge violated Article 13D's procedural provisions. Now that we have foreclosed a monetary award on the latter ground, it will presumably remain open to Great Oaks on remand to reassert the claim that the charge does not conform to the substantive limitations of Article 13D. It therefore also remains open to the District to contend that such a theory cannot support monetary relief, because liability on that basis was not asserted in the pre-suit claim.

Nothing in the pre-suit claim apprised the District of any potential liability, on any factual basis, *under Article 13D*. But under the cases discussed in the previous section, the foremost question is not whether a claim fully delineates the *legal theories* on which liability may be imposed but rather whether it sufficiently notifies the public entity of the operative *facts*, with particular emphasis on the *acts or omissions* by the entity on which an award of damages may be predicated. (See *Stockett*, *supra*, 34 Cal.4th at p. 446 [claim "need only 'fairly describe what [the] entity is alleged to have done' "].)

Here the pre-suit claim rested on two acts by the District: using groundwater proceeds for purposes outside those specified in section 26.3 of the District Act; and setting the charge at an excessive level in order to defray these improperly incurred expenses. In its trial brief, Great Oaks alleged that the District had violated the

50

substantive limitations of Article 13D by (1) charging a disproportionate part of the fee to non-agricultural users (see Art. 13D, § 6, subd. (b)(3)), as reflected in the differential in rates as between agricultural and non-agricultural extractions;[18] (2) charging Great Oaks for services not used by or immediately available to it (see Art. 13D, § 6, subd. (b)(3)), in that extractors were required to pay for treated and imported water that they did not use; and (3) charging more than was required to provide the property related service on which the charge was predicated (see Art. 13D, § 6, subd. (b)(3)), in that the charge "ha[d] no relation to and exceed[ed] the costs of providing" whatever service the District provided to Great Oaks.

Nothing in the pre-suit claim presaged an attempt to impose liability based on the differential in rates between agricultural and non-agricultural extractions. Nor does the claim hint at the possibility that the District had exposed itself to liability by charging for services not readily available to the extractor. It follows that no monetary relief can be predicated on either of these theories.

However, the factual predicate for the third theory noted above closely resembles the factual predicate for the District Act claims asserted by Great Oaks prior to suit. The pre-suit claim asserted that the District was overcharging extractors by assessing them for activities not authorized by the District Act; the third Article 13D theory asserted that the District was overcharging extractors by assessing them more than was required to provide the property-related services the District rendered to them. The only difference between the two theories is that the first posited charges for activities beyond those permitted to be financed by the charge, while the second posited charges beyond those actually provided

---

[18] Great Oaks acknowledged that this differential was mandated by the District Act. (See District Act, § 26.7, subd. (a)(3)(D).) It contended, however, that this mandate "must fall in the face of [Article 13D's] subsequent constitutional requirement." (Citing *Silicon Valley, supra,* 44 Cal.4th 431.)

to extractors by the District. Given the complex context of these charges, we cannot say that the factual variance between these two theories is so great as to flatly preclude monetary relief based on Article 13D. Much may depend on the actual facts that might be found in support of this theory. The trial court made no pertinent findings, but we cannot say that it would be categorically foreclosed on remand from finding facts sustaining this theory and nearly enough resembling the facts set forth in the pre-suit claim to permit monetary relief. Monetary relief appears to be foreclosed, however, on the other theories of liability suggested by Great Oaks under Article 13D.

## II. District Act

### A. Introduction

As noted above, the only objection originally asserted by Great Oaks was that the District had violated the District Act by spending proceeds of the groundwater fee on activities for which the Act did not authorize such expenditures, and by overcharging extractors in order to defray these unauthorized expenses. (See Background pt. A, *ante*.) This theory was pursued through trial on the basis of multiple subsidiary allegations, most of which the court found "not supported by the evidence." The court was persuaded, however, that "the District abused its discretion, and violated Section 26.3 of the District Act, when fixing the Plaintiff's groundwater charges," in that the charges were not based upon cost of service, and that a "disparity" existed "between actual cost of benefits conferred on Great Oaks and the charges imposed" on it. It cited expert testimony as well as an April 2000 independent audit report "which indicated that the 'District's cost of service calculations may no longer be valid especially with respect to servicing North vs. South County . . . the revenue recovered from one or more of the District's customer classes may be subsidizing those from other classes . . . the District should review its agricultural water pricing practice for adequacy and fairness.' " The court noted that the District "did not change its policy" despite this report.

52

The court also found that the District had abused its discretion "with regards to spending." Specifically, the District (1) "improperly used groundwater revenue for activities not within the scope of Section 26.3 of the Act"; (2) "unwisely commingled groundwater revenue with other monies"; and (3) overcharged Great Oaks by (a) over-budgeting for "employees, cost of equipment and water contract purchases," (b) "placing the excess money in its reserve fund," and (c) failing to credit these surpluses back to Great Oaks "when appropriate."

## B. Standard and Scope of Review

### 1. Background

In its Phase I trial brief the District argued that the court was obliged to apply a highly deferential standard of review to Great Oaks's claims that the District had violated the District Act in fixing the groundwater charge and spending the proceeds. It contended that these actions could only be overturned if Great Oaks demonstrated that they were "so palpably unreasonable and arbitrary as to indicate that [the District] abused its discretion as a matter of law." It asserted that the matter was governed by the principles applicable to "judicial review of a legislative or quasi-legislative action," which is to be conducted "under ordinary mandamus, and . . . limite[d to] an examination of the proceeding to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency has failed to give the notices and follow the procedures required by law." (Citing *Harris v. Civil Service Com.* (1998) 65 Cal.App.4th 1356, 1363.) In addition, the District asserted, Great Oaks "ha[d] the burden to show that no substantial evidence supported the District's determination of the groundwater rates."

In its reply to the District's trial brief, Great Oaks failed to meet these assertions squarely. Rather, in a section of the brief purporting to address the applicable standard of review, it asserted that under *authority applying Article 13D*, courts are to exercise their

53

independent judgment on the question "whether assessments, fees and charges are proportional to the benefits received by those paying the assessment, fee or charge." (Citing *Silicon Valley*, *supra*, 44 Cal.4th 431.) It then offered this sentence: "Because the groundwater charge involves Proposition 218 application, neither the substantial evidence test nor the arbitrary and capricious test applies in determining whether the District has complied with its Act." It completed its evasion of the issue by observing that matters of statutory construction raise only questions of law, followed by a recitation of rules of statutory construction.

The trial court gave no indication of the standard of review it applied to the District Act claims other than to declare that the District had abused its discretion in fixing the charge and in spending the revenues received from it.

### 2. Rule of Decision in Trial Court

The District was quite correct to tell the trial court that the District Act claims were challenges to quasi-legislative acts and, as such, should be evaluated under the "arbitrary and capricious" standard of review. An administrative agency's decision to impose a fee, charge, or other exaction is a quasi-legislative act. (See *Homebuilders Ass'n of Tulare/Kings Counties, Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 561 [city's adoption of development impact fees was quasi-legislative act]; *Shapell Indus., Inc. v. Governing Bd.* (1991) 1 Cal.App.4th 218, 231 (*Shapell Industries*) [same, school district's adoption of facilities fee]; *Balch Enterprises, Inc. v. New Haven Unified Sch. Dist.* (1990) 219 Cal.App.3d 783, 791 [same]; *Carlton Santee Corp. v. Padre Dam Mun. Water Dist.* (1981) 120 Cal.App.3d 14, [rules and rates for water and sewer service]; *Kahn v. East Bay Mun. Util. Dist.* (1974) 41 Cal.App.3d 397, 409, quoting *City Council v. Superior Court* (1960) 179 Cal.App.2d 389, 393 [" 'The fixing or refixing of rates for a public service is legislative, or at least quasi legislative.' "].)

54

An agency also exercises quasi-legislative power when it decides how to manage and spend the funds under its control. (See *California Assn. of Professional Scientists v. Department of Finance* (2011) 195 Cal.App.4th 1228, 1232, quoting *Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1323 [state personnel department's authority to set salaries described as " 'quasi-legislative' "]; *SN Sands Corp. v. City and County of San Francisco* (2008) 167 Cal.App.4th 185, 191 [agency's award of contract, and acts leading up to it, are quasi-legislative]; *Carmel Valley Fire Protection Dist. v. State* (2001) 25 Cal.4th 287, 302 [challenged budget measures were "an expression of the Legislature's essential duty to devise a reasonable budget"]; *Scott v. Common Council* (1996) 44 Cal.App.4th 684, 688 [trial court's order invalidating city council's elimination of funding for city attorney's investigators raised "the question of the power of the trial court to interfere with the legislative process of adopting a budget"]; *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 390-391 [applying standard of review for quasi-legislative action to spending directives issued by department director; holding them void as beyond statutory authority]; *American Canyon Fire Protection Dist v. County of Napa* (1983) 141 Cal.App.3d 100, 106 [distribution of funds by county board was quasi-legislative]; *Board of Supervisors v. California Highway Commission* (1976) 57 Cal.App.3d 952, 960 [in determining when highway project should be "funded and constructed ," highway commission "acted as a legislative body, exercising quasi-legislative powers"].)

The quasi-legislative actions of administrative agencies are generally reviewed by a proceeding in ordinary mandate, in which judicial review is constrained by several principles. Foremost of these is that the judicial inquiry is generally " ' "confined to the question whether the classification is 'arbitrary, capricious, or [without] reasonable or

55

rational basis.' " ' " (*American Coatings Assn., Inc. v. S. Coast Air Quality Dist.* (2012) 54 Cal.4th 446, 460 (*American Coatings*).)[19]

As noted above, the District duly invoked this deferential standard of review in its trial brief, while Great Oaks evaded the issue. On appeal Great Oaks contends that this standard does not apply here because "this is not a review of a proceeding in mandamus, but is instead the review of the trial court's decisions on issues and procedures agreed and consented to by the District." This highly ambiguous statement suggests two possible grounds for holding the above standard of review inapplicable: first, that the trial court did not grant relief in mandamus—in fact it expressly denied such relief; and second, that the parties' agreed method of trying the case excused the court from applying this standard of review. Neither premise is sound.

It is true that the District stipulated to certain procedures that appear unusual in a proceeding of this kind. (See discussion in next sub-part.) But we see no indication that it waived the deferential standards ordinarily limiting judicial review of quasi-legislative actions. Nor is there any sign that the court believed the principles governing review by mandate were wholly inapplicable. The court apparently accepted as a rule of decision that the District could be liable only if found to have abused its discretion; to that extent the court's statement of decision echoes the general principles governing proceedings in mandate. (See *American Coatings*, *supra*, 54 Cal.4th at p. 460.) So far as we can tell, the court simply overlooked the more stringent test applied in the present context to determine whether an abuse of discretion occurred.

---

[19] A quasi-legislative act will also be invalidated if it exceeds the authority delegated by the Legislature (see *Diageo-Guinness USA, Inc. v. State Bd. of Equalization* (2012) 205 Cal.App.4th 907, 915) or if the delegation itself is constitutionally infirm (see *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 491-492). Neither party appears to have alluded to either of these potential grounds of invalidation.

Nor does the court's denial of relief in mandate exempt this action from these limitations on judicial review. In the first place, the court's decision not to grant writ relief seems to rest on the premise that as framed by Great Oaks, the prayer for such relief was moot. In its cause of action for a writ of mandate, Great Oaks alleged that the District had "abused its discretion" in five particulars, and prayed for a writ directing the District to take or refrain from six specified actions.[20] The court explained its denial of writ relief by stating that "the illegal fee collection activity . . . has already occurred." The court apparently viewed the writ as appropriate only for prospective relief. In this regard the court appeared to equate writ relief with injunctive relief—which it also denied, at the same time and on the same grounds.

The court may also have concluded that writ relief was inappropriate because an adequate remedy at law existed in a simple award of damages. (See Civ. Code, § 1086 ["The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law."].) In fact, however, no legal basis for such an award has ever been identified. Apparently it never occurred to the parties or the court to inquire into the availability of a simple money judgment against the District based upon claimed violations of the Act. Yet when it comes to awarding damages against public

---

[20] Great Oaks prayed that the District be directed to (a) "limit future assessment of groundwater charges against Plaintiff to only the amount necessary to fund the specific purposes authorized by the [District] Act," (b) "limit spending of groundwater charge monies to the purposes set forth in § 26.3 of the Act," (c) "acknowledge that the setting of groundwater charge rates to encourage the purchase of treated water is a violation of Section 26.3 of the Act," (d) "not use groundwater charges to provide treated surface water; alternately, . . . to revise the Groundwater Charge zones to reflect the specific purposes of Section 26.3 of the Act, including but not limited to the distinction between [those] who benefit and those who do not benefit from treated surface water," (e) "collect groundwater charges and fines from all persons producing groundwater in strict accordance with the Act," and (f) "obtain a favorable vote of zone residents before increasing groundwater charges."

entities, sovereign immunity is the rule and liability is the exception. (See *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 689 [public entity defendants could be held liable for alleged violations of water safety standards "*only* if there is a statute subjecting them to civil liability. [Citation.] In the absence of such a statute, . . . sovereign immunity bars the suit."]; *ibid.*, quoting Legis. Com. com., 32 West's Ann. Gov.Code (1995 ed.) foll. § 815, p. 167 ["Government Code section 815 . . . 'abolishes all common law or judicially declared forms of liability for public entities, except for such liability as may be required by the state or federal constitution[.]' "].)

Although the parties have described this action at various times as an action for a refund, they have never offered statutory or other authority for entering a money judgment in such an action. In such circumstances the appropriate remedy appears to be a writ of mandate directing the District to refund all or part of the charges paid, and the action is governed by the standards of review described above. (See *Balch Enterprises, Inc. v. New Haven Unified School Dist., supra,* 219 Cal.App.3d 783, 791 [action for refund of school facility fees, "[a]s an action challenging a quasi-legislative action," was "one of ordinary mandamus . . . governed by more limited standards of review"]; *Shapell Industries*, *supra*, 1 Cal.App.4th at p. 225 [affirming issuance of mandate directing refund of school facility fee]; *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840, 867 [same]; *Frost v. Trustees of Cal. State University and Colleges* (1975) 46 Cal.App.3d 225, 228 ["Mandamus is the proper remedy to compel the Trustees of the California State University and Colleges to pay back salary wrongfully withheld from a state university academic employee."]; *Western/California, Ltd. v. Dry Creek Joint Elementary Sch. Dist.* (1996) 50 Cal.App.4th 1461, 1473, 1492 [reversing, on substantive grounds, writ directing refund of facility fee]; cf. *Schoderbek v. Carlson* (1980) 113 Cal.App.3d 1029, 1037 [mandate not available to secure refund of property taxes where statutory action for refund supplied adequate remedy at law],

58

disapproved on another point in *Woosley v. State of California* (1992) 3 Cal.4th 758, 792.)

Thus, while the trial court apparently denied writ relief in favor of a monetary judgment, it appears that the judgment can only be upheld if viewed as a *grant* of writ relief directing payment of money. Great Oaks's contention that we are not "review[ing] . . . a proceeding in mandamus" is thus revealed as only superficially correct, at best. In substance that is exactly what we are doing.

Finally, and most fundamentally, the standard of review in an action seeking to overturn the quasi-legislative acts of an administrative agency does not depend on the form in which the challenge is framed, or on the nature of the relief prayed for. In *Lewin v. St. Joseph Hosp. of Orange* (1978) 82 Cal.App.3d 368 (*Lewin*), a doctor argued that a decision to exclude him from a hospital staff must be reviewed under the more searching standards governing administrative mandate (see Code Civ. Proc., § 1094.5) because it amounted to an adjudication of his rights. The court rejected this contention because the decision rested on a policy decision by the hospital to maintain a closed staff. " 'Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.' " [Citations.] . . . . What was involved was the formulation, or to be more precise, the retention of a rule of general application, not the application of a rule to a specific set of facts or a particular individual. [¶] . . . [W]e are confident the limited judicial review applicable to the quasi-legislative actions of a governmental administrative agency is also appropriately applied to judicial review of rule-making or policy-making actions of a nonprofit hospital corporation." (*Lewin, supra,* 82 Cal.App.3d at pp. 383-384; see *id.* at p. 385, citing *Ascherman v. St. Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 511-512 [noting that restrictive scope of review in cited case "was in no way based on mandate considerations"].)

59

In other words, here as in so much of the law, substance must prevail over form. This is necessary to effectuate the fundamental policy concerns—in part, structural constitutional concerns—restricting judicial review of quasi-legislative actions. "The courts exercise limited review of legislative acts by administrative bodies out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 211-212, fn. omitted; see *Shapell Industries*, *supra*, 1 Cal.App.4th at p. 230; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572 (*Western States Petroleum*).) Those concerns do not shrink, let alone disappear, simply because a challenge takes a form other than a petition for mandate. Here the Legislature has delegated to the District the authority to fix a groundwater extraction fee according to specified criteria, and to spend the proceeds of that fee within given guidelines. For a court to simply substitute its own judgment for the judgment of the body thus charged with legislative power would violate the separation of powers and infringe upon the Legislature's prerogative to delegate its authority to duly constituted administrative entities.

We conclude that the question whether the charge complies with the District Act should have been determined in accordance with the restrictive principles generally governing judicial review of quasi-legislative action.

### 3. Extrinsic Evidence

Although we see no sign that the District forfeited the restrictive standard of review described above, the same cannot be said for the principle, first cited in its opening brief here, that judicial review of quasi-legislative acts "is ordinarily limited to the administrative record." (Citing *Western States Petroleum, supra,* 9 Cal.4th 559, 575-576; see *American Coatings, supra,* 54 Cal.4th 446, 460.) The District's failure to invoke

60

this principle in the trial court, its active participation in the rule's wholesale disregard, and its failure to produce or identify an administrative record, preclude application of this rule at this late date.

First, the District has never identified an administrative record to which review should or can be confined. Indeed, as we have previously mentioned, at least some crucial documents that apparently led up to the adoption of the 2005-2006 groundwater extraction rates appear to be absent from the appellate record. (See fn. 12, *ante*.) In addition, an administrative record would ordinarily include some record of the hearings leading up to the adoption of the challenged rates and any objections or other submissions placed before the District in connection with those hearings. We see no such materials in the record.

Since the administrative record is an unknown quantity, and the rule confining review to that record seems never to have been pressed upon the trial court, it is impossible to say that the trial court erred by failing to limit review to such a record. Further, any error in this regard was clearly invited by both parties when they joined in stipulating, prior to the commencement of Phase I of trial, to the admission of "the declarations, deposition testimony and exhibits" accompanying their respective trial briefs as well as to additional declarations to be submitted by both parties, with each reserving the right to cross-examine the other's declarants. Based on this stipulation, Great Oaks offered several newly prepared declarations as well as 144 additional documents comprising some 13 volumes of the appellate transcript. The District responded with its own declarations and nearly 200 documents spanning 33 volumes and some 9,500 pages. The trial court itself placed seven exhibits on the record, spanning two volumes and taking up some 323 pages. The resulting 55-volume appendix comprises 15,621 pages including not only trial testimony but deposition excerpts and other materials apparently produced in discovery. Both parties also called live witnesses

61

at trial, producing some four days of testimony in Phase I, with neither side objecting to this procedure. At the conclusion of the Phase I trial, the attorneys stipulated in open court that all exhibits that had been marked for identification were admitted into evidence.

The District thus actively participated in trying this case entirely free of the rule it now seeks to invoke on appeal. Under the circumstances we must conclude that to the extent the trial court's admission of such evidence was error, it was invited. (See 9 Witkin, *supra*, Appeal, § 389, p. 447.)

However, the fact that the court cannot be faulted for admitting this evidence does not mean that it was free to depart from all constraints on judicial review of quasi-legislative actions. Regardless of the evidence before it, "[a] court reviewing a quasi-legislative act cannot reweigh the evidence or substitute its own judgment for that of the agency." (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1406.) Even when extra-record evidence has been received, "the determination whether the decision was arbitrary, capricious or entirely lacking in evidentiary support must be based on the 'evidence' considered by the administrative agency." (*Lewin , surpa,* 82 Cal.App.3d 368, 387, fn. 13, citing *Brock v. Superior Court* (1952) 109 Cal.App.2d 594, 607, 608.) "If courts were to independently weigh conflicting evidence in order to determine which side had a preponderance of the evidence, this would indeed usurp the agency's authority and violate the doctrine of separation of powers." (See *Western States Petroleum*, *supra*, 9 Cal.4th at p. 576.) Thus, while the parties' stipulation entitled the trial court to consider the evidence before it for purposes of illuminating the controversy, it should have confined itself to the question whether the challenged actions were arbitrary, capricious, or wholly unsupported by the evidence before the District.

62

Certainly the District's actions could not be invalidated based solely or primarily on the basis that expert witnesses, testifying after the fact, expressed disagreement with the District's approach to the issues at hand. The Supreme Court has indicated that while courts may admit evidence to establish that an agency has "adequately considered all relevant factors," they cannot allow the issue to become "whether the decision was wise or scientifically sound in light of the extra-record evidence," because "such questions are not for the courts to answer." (*Western States Petroleum*, *supra*, 9 Cal.4th at p. 577.) Here, given the parties' mutual agreement to try the matter in an unorthodox manner, the testimony of such witnesses might reasonably be consulted on matters such as industry practice or applicable accounting concepts. But testimony merely taking issue with the suitability of the District's methodology could not sustain a determination that the District's actions were arbitrary, capricious, or entirely unsupported by evidence.

### C. *Application*

#### 1. Introduction

In analyzing any challenge to quasi-legislative action, the first step is to clearly identify the manner or manners in which the action is claimed to infringe the law, and the legal principle or principles it infringes. It is not enough for a challenger to say that some ruling by the agency was unlawful; it is necessary to clearly delineate *how* the action was unlawful, i.e., what rule, standard, or provision of prescriptive law it is alleged to have transgressed. Only then is it possible to ascertain the rule of decision applicable to the claim. For these purposes, it is useful to subdivide the potentially relevant issues into the three familiar categories: questions of law, questions of fact, and questions entrusted to the decisionmaker's discretion.

A determination in the third of these categories—a purely discretionary determination—requires the highest degree of judicial deference. Such a determination will often include a large normative component; an example would be whether a

63

particular methodology is fair or reasonable. Such a question is likely to call most heavily upon the agency's presumptive expertise, meaning essentially its familiarity with the competing interests, risks, benefits, and other concerns that must go into any reasoned policy assessment. Such determinations are also likely to lie nearest the heart of the power entrusted to the agency by the Legislature. In both of these senses, the *competence* of the agency is squarely implicated, and the court's presumptive relative *lack* of competence poses the most acute hazard.

For determinations in the second category—administrative *findings of fact*—the basic rule is that an agency's finding must be sustained unless it is " 'entirely lacking in evidentiary support.' " (*American Coatings, supra,* 54 Cal.4th 446, 460; *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786, abrogated on another point in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 917-918.) This " 'is not the same as a substantial evidence test.' " (*American Coatings*, *supra*, 54 Cal.4th at p. 461, quoting *Golden Drugs Co., Inc. v. Maxwell-Jolly* (2009) 179 Cal.App.4th 1455, 1466, and citing *Shapell Industries*, *supra*, 1 Cal.App.4th at p. 232.) It is not, however, so abjectly deferential as to amount to no review at all. (See *Shapell Industries*, *supra*, at p. 232.) Essentially the question is whether the evidence before the agency afforded a rational basis for the challenged finding. If it did, any further inquiry must end and the finding must be accepted for purposes of judicial review.

In reviewing an agency's determinations on questions of law, courts employ a less deferential standard than in either of the other two categories. This reflects the fact that our tripartite system of government charges the judiciary, not the legislative or executive branches, with the final responsibility to determine the meaning of laws. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4 (*Yamaha Corp.*), citing *Whitcomb Hotel, Inc. v. Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757.) Some

deference to an agency's interpretation of applicable law is nonetheless warranted, or at least *may* be warranted, depending on context.  In particular, if the agency is "interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues.  It is this 'expertise,' expressed as an interpretation (whether in a regulation or less formally . . .), that is the source of the presumptive value of the agency's views.  An important corollary of agency interpretations, however, is their diminished power to bind.  Because an interpretation is an agency's *legal opinion*, however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference."  (*Yamaha Corp.*, *supra*, 19 Cal.4th at p. 11.)

### 2.  Miscalculation of Charge

The trial court first found that the District had "abused its discretion, and violated Section 26.3 of the District Act, when fixing the Plaintiff's groundwater charges."  This statement conveys not *how* the District is thought to have abused its discretion, but when it did so.  The ensuing discussion of the evidence suggests that the abuse of discretion consisted of (1) failing to "levy charges based on a cost of service analysis" and (2) relying on a "determination of the cost of benefits to Great Oaks" that was "excessive."  These subsidiary findings were expressed somewhat obliquely, i.e., by attribution to Thomas O'Rourke, a forensic accountant called by Great Oaks, whose opinions the court apparently meant to adopt, in part, as its own.  This is an unfortunate mode of proceeding, particularly because the tenor of the findings thus adopted is not entirely clear.  The court explicitly *rejected* the O'Rourke testimony insofar as it rested on the testimony of another Great Oaks expert, James Ulrick, who had testified in essence that due to hydrological barriers between some District projects and the wells operated by Great Oaks, the costs of those projects could not properly be assessed to Great Oaks.  In rejecting that opinion, the court also rejected the O'Rourke testimony depending on it.

65

The court presumably made some effort to quantify the effects of this partial rejection before it awarded "damages" to Great Oaks. Its methodology in doing so, however, is not apparent.

Further, we detect considerable tension between the assertion that the District "did not levy charges based on a cost of service analysis" and the immediately ensuing statement that "the determination of cost of benefits to Great Oaks was excessive." The first statement seems to posit that the District failed entirely to take costs of service into account in fixing the groundwater charge. But the second statement posits that the District had in fact "determin[ed] . . . the cost of benefits to Great Oaks," but had overstated them. If the District did not base the charge on cost of service, it had no apparent occasion to determine those costs.

The tension between these findings can be traced, in part at least, to the court's failure—and an underlying failure by O'Rourke and Great Oaks—to distinguish among three potential faults in the District's determination of the groundwater charge: (1) failing to base the charge on costs (i.e., basing it on something else); (2) basing the charge on cost items not properly attributable to groundwater extractors; and (3) overstating costs otherwise properly attributed to extractors.

The conflation of these three concepts pervades O'Rourke's testimony.[21] Thus he appeared to suggest on the one hand that the District had wholly failed to base the groundwater charge on an assessment of costs, declaring that it "does not levy its groundwater charges in accordance with any cost-of-service analysis," and that it had

---

[21] Much of O'Rourke's testimony at trial is at best only semi-intelligible, perhaps due to mistranscription. An example is this pronouncement: "Cost of service obligations require you to keep some contract as to what the nexus or the correlation between the cost of recurred activity and the useful application of those incurred costs apply." Fortunately the testimony appeared to largely track the opinions he expressed in a declaration, which was also before the court.

66

failed to comply with "standard accounting and costing principals [*sic*]," which "call for a fair matching of revenue and expenses for measuring performance or pricing with the service activities of the governmental unit." It elsewhere appeared, however, that his primary criticism was the District's asserted failure to properly define the costs it sought to recoup through the charge. The "underlying assumption" of the District's policies, he testified, was that "there will be a general averaging of the cost of water across the entire Water District." In his view, a proper cost-of-service methodology would be based entirely on the cost of directly replacing groundwater: "[Y]ou need to be able to establish a local area cost of providing injection service; in order to establish how much service— how much water is flowing as a replacement of groundwater."[22]

This last quotation seems to reflect a central point of O'Rourke's testimony: that the District was *violating the District Act* by *charging groundwater extractors for services other than direct recharge of the groundwater basin*. He expressed this opinion most clearly in the following passage of his declaration: "In accordance with § 26.3 of the District Act groundwater charges are to be levied and spent to pay for the cost of services that benefit all who rely directly or indirectly on the groundwater supplies of the zone or zones. In other words, the groundwater charges can be levied in order to recoup the [District's] costs in *maintaining and recharging the groundwater basins*. However, [the District] does not levy its groundwater charges in accordance with any cost-of-service analysis." (Italics added.) He opined that "it would be both customary and appropriate for [the District] to separately account for groundwater charge money so that it is spent only in accordance with the requirements of the District Act." Instead, he declared, the District was using groundwater revenues to finance "projects" that were

---

[22] Later O'Rourke asserted that the District engaged in various budgeting practices that resulted in the exaggeration of certain projected cost items, producing oversized reserves; we discuss this aspect of his testimony in the following section.

"not within the scope of § 26.3," including to pay for "*any* activity of the entire Water Utility Enterprise, even if it does not relate to groundwater supplies." (Italics original.) The District, he declared, failed to "separately account for the groundwater charge money so that it is spent only in accordance with the requirements of the District Act." Further, "[w]hile it [wa]s possible for [the District] to account for revenues and related expenditures, determine cost of service[,] and properly budget its activities and projects to be fully consistent with its duties and obligations under Section 26.3, [the District] does not do so." In contrast to a provision of the Act permitting the use of ad valorem tax revenues to pay general District expenses, he continued, "[s]ection 26.3 . . . does not permit groundwater charges to be used for such general expenses." Groundwater charges were also "com[m]ingled in the Water Utility Enterprise Fund and used for non groundwater supply uses. Also, groundwater charge proceeds are used for Watershed Funds purposes. Theses [*sic*] are not purposes covered by §26.3."

Given this pervasive reliance on O'Rourke's interpretation of the District Act, and particularly section 26.3, it is not surprising that in a document entitled "Citation to Evidence," Great Oaks cited O'Rourke as the "Source" for the "Fact" that "[t]o comply with the groundwater provisions of the Act there should be separate accounting to insure groundwater charge funds are only spent on projects authorized under §26.3 of the Act."

But of course the meaning of the District Act is not a "fact" subject to evidentiary proof. It is a pure question of law. It is a matter, furthermore, as to which the witness was never shown to possess any expertise, or for that matter competence. He was an accountant, not an attorney, and he gave no testimony of a type that an accountant might give bearing on the meaning of a statute—such as how similar statutes, if any, were understood or applied in contexts with which he was familiar. So far as the record shows, he simply took it upon himself—or had it given to him by Great Oaks—to give an interpretation of section 26.3 and to base much of his own opinion on that interpretation,

68

which in turn furnished a foundation for many if not most of the challenges sustained by the court.

The trial court gave no explanation for its adoption of O'Rourke's interpretation of the District Act in preference to that implicitly adopted and applied by the District. It simply declared itself "convinced" by his testimony. Of course the meaning and effect of the statute was ultimately a question for the courts, and to that extent the District's interpretation could not bind the trial court. (See *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1106, fn. 7 ["[w]hile the [agency's] construction of a statute is entitled to consideration and respect, it is not binding and it is ultimately for the judiciary to interpret this statute"].) But it was a matter presumptively within the District's competence and expertise, such that the trial court should have accorded it " ' "great weight and respect." ' " (*American Coatings, supra,* 54 Cal.4th 446, 461, quoting *Yamaha Corp., supra,* 19 Cal.4th 1, 12.) There is no indication that the court did so.

In all these respects the trial court's treatment of the issue might be dismissed as harmless if it were clear that the construction of section 26.3 put forward by Great Oaks in the guise of expert accounting testimony was correct. But by treating that question as a matter of evidentiary proof, the parties excused themselves from presenting more relevant data, such as legislative history, bearing on the purely legal question of what costs could properly be assessed to groundwater extractors under section 26.3 This leaves us with nothing to work from except the text of the statute. We find nothing there compelling the conclusion that, as O'Rourke declared, "The groundwater charge is intended [only] to compensate the District for its *direct costs of providing injection or infiltration services* to augment the takes from specific areas of groundwater pumping." (Italics added.) Or as he put it at trial, "[Y]ou need to be able to establish a local area

69

*cost of providing injection service*[] in order to establish how much service—*how much water is flowing* as a replacement of groundwater."

Without foreclosing the possibility that this interpretation, or something like it, is correct, we note that it appears to require reading language into the statute that does not appear there. Section 26.3 of the District Act enumerates four "purposes" for which the "proceeds" of the groundwater charge "are authorized and shall be used exclusively." The first three are to "pay the costs" of (1) facilities for importing water, (2) purchases of imported water, and (3) "facilities which will conserve or distribute water within such zone or zones, including facilities for ground water re-charge, surface distribution, and the purification and treatment of such water." (District Act, § 60-26.3, subds. (1)-(3).) The fourth permitted purpose is to discharge indebtedness incurred for any of the first three. (District Act, § 60-26.3, subd.(4).)[23] Nothing in the language of this provision

---

[23] As pertinent here, section 26.3 provides: "Ground water charges levied pursuant to this act are declared to be in furtherance of district activities in the protection and augmentation of the water supplies for users within a zone or zones of the district which are necessary for the public health, welfare and safety of the people of this State. The ground water charges are authorized to be levied upon the production of ground water from all water-producing facilities, whether public or private, within said zone or zones of the district for the benefit of all who rely directly or indirectly upon the ground water supplies of such zone or zones and water imported into such zone or zones.

"The proceeds of ground water charges levied and collected upon the production of water from ground water supplies within such zone or zones of the district are authorized and shall be used exclusively by the board for the following purposes:

"1. To pay the costs of constructing, maintaining and operating facilities which will import water into the district which will benefit such zone or zones, including payments made under any contract between the district and the State of California, the United States of America, or any public, private or municipal utility.

"2. To pay the costs of purchasing water for importation into such zone or zones, including payments made under contract to the State of California, the United States of America, or any public, private or municipal utility.

70

limits the application of proceeds to activities resulting directly in *recharge* of the groundwater basin, as distinct from conservation and maintenance of groundwater supplies—or indeed, of overall water supplies.[24] On the contrary, the opening sentence declares that the charge is intended to further "the *protection and* augmentation" (italics added) not merely of groundwater, but of "the water supplies . . . of the district." (§ 26.3.) By its terms the Act authorizes the expenditure of groundwater revenues not only to build facilities for water importation, and to pay for imported water, but also to "conserve or distribute water within such zone or zones, *including* facilities for ground water re-charge, *surface distribution*, *and* the purification and treatment of such water." (*Id.*, subd. (3), italics added.) In the absence of a more cogent showing than Great Oaks has thus far attempted, this language seems to express an intention that direct recharge of the groundwater basin is *not* the sole activity to which groundwater revenues may properly be applied, but that they may also be spent on all forms of "conserv[ation] or distribut[ion] [of] water within [a] zone," including "surface distribution" and water "purification and treatment." (*Ibid.*) On its face this language furnishes a complete

"3. To pay the costs of constructing, maintaining and operating facilities which will conserve or distribute water within such zone or zones, including facilities for ground water re-charge, surface distribution, and the purification and treatment of such water.

"4. To pay the principal or interest of any bonded indebtedness or other obligations incurred by the district on behalf of such zone or zones for any of the purposes set forth in paragraphs 1, 2 and 3 of this section.

[24] Nor, incidentally, does this provision by its terms mandate or prohibit any particular methodology for *fixing* the charge; it regulates only the uses to which the proceeds are actually put. While this may amount to the same thing in practice, the statute provides no apparent basis for the attempt by Great Oaks to distinguish between a cost-of-service approach and one based on "revenue requirements." The question is not whether the actuating financial necessity is designated a "cost" versus a "requirement," but whether it is an expenditure of a type to which groundwater charge proceeds may be applied.

answer to the recurring theme of the O'Rourke testimony that the charge was improperly predicated on the District's costs in generating and distributing treated water.

Indeed, the foregoing language may be read as a ratification of the District's "conjunctive use" policy, which treated all forms of water as "fungible" and sought to equalize pricing accordingly. Elsewhere in its opinion the trial court appeared to conclude that this policy was not in itself a violation of the District Act. It declared that "Great Oaks is advantaged" by the policy, which "involves the coordinated management of both surface and groundwater in order to maximize the efficient use and preservation of the resource." It then proceeded to cite only the District's activities in direct recharge of groundwater. But it seems equally apparent that the provision of alternative supplies of water serves the long-term interests of extractors by reducing demands on the groundwater basin and helping to prevent its depletion. It is of course true that the short-term interests of water retailers might be best served by *maximizing* demand, and thus by lower prices; but this merely reflects the reality that here as in many other situations, different policies may produce different *kinds* of benefits, sometimes of a competing or mutually exclusive nature. We see nothing in the record that would make it arbitrary, capricious, or irrational for the District to conclude that reduced demands on groundwater supplies benefit retailers by preserving the commodity on which their long-term viability, if not survival, may depend.[25]

This same reasoning casts doubt on the suggestion in the O'Rourke testimony and the trial court's statement of decision that groundwater proceeds could not lawfully be applied to "subsidize" treated water. Again, without intending to foreclose legal arguments that the parties have not yet elected to make, we see nothing in the District Act

_____

[25] We are reminded of the song lyric from a half-century ago: "You don't miss your water / Till your well runs dry." (William Bell, "You Don't Miss Your Water" (Universal Music Pub. Group 1961).)

that requires the District to limit the extent to which groundwater proceeds may be applied to treating and distributing surface water. Section 26.3 explicitly contemplates that groundwater revenues can be expended on such water. It explicitly contemplates that groundwater recharge is *not* the exclusive purpose to which the charge may be applied. This appears to vest in the District the discretion to determine *how much* groundwater revenue should be applied to such purposes. Accountant O'Rourke objected to the District's apparently having selected a rate based in part on the intention to price treated water competitively with groundwater, thus further reducing market pressures on the latter, and helping to preserve it. But if the Act permits the use of groundwater proceeds to "subsidize" treated water, the question of how much to do so seems one which the District is preeminently competent to answer, and the courts are not.

We have structured our discussion largely around the O'Rourke testimony because the trial court's finding of violations of the District Act appears to have depended most heavily on that testimony. However the court also quoted the statement in a 2000 independent audit that " '[the] District's cost of service calculations *may* no longer be valid especially with respect to servicing [n]orth vs. [s]outh County [customers] . . . the revenue recovered from one or more of the District's customer classes *may* be subsidizing those from other classes . . . . the District *should review* its agricultural water pricing practice[s] for adequacy and fairness.' " (Italics added; bracketed material added to conform to quoted source.) The court noted that the District had failed to "change its policy in spite of the audit." According to the quoted language, however, the audit was merely raising possibilities and questions about the District's pricing practices, not condemning them.[26] In an apparent attempt to address those questions, the District

---

[26] The court omitted some language further indicating the tentative nature of the audit's conclusions: "[T]he revenues recovered from one or more of the District's customer classes may be subsidizing those from other classes, creating an inequitable

73

engaged another firm that prepared a lengthy study on the subject. While that report suggested that the District might consider various "further refinements" in its methodology, it is far from clear that anything in it points to an abuse of discretion in the District's then-practices—let alone in the rates it adopted four or five years later.

The trial court apparently relied largely on the studies just described for its conclusion that Great Oaks was "overcharged because of . . . discounts given to agriculture water users." But the Act *requires* such "discounts," declaring that the charge for agricultural water "shall not exceed one-fourth of the rate for all water other than agricultural water." (District Act, § 26.7.) To be sure, the rates adopted by the District went well beyond this ratio; the 2005-2006 extraction charge for agricultural use was one-tenth of the charge for other extractors. The District defends this differentiation on the ground that, apart from the statutory mandate, "agricultural use puts less demands, including reliability demands, on the water supply." We will not attempt to evaluate this rationale except to observe that it appears never to have been challenged by Great Oaks on any basis distinct from that of its challenge to the "subsidy" of treated water.

The District Act manifestly vested the District with discretion to determine what the "discount" for agricultural extractions should be when it decreed a ratio "not exceed[ing]" a specified fraction. We see nothing in the record sustaining a conclusion that the District's ten-to-one ratio was arbitrary, capricious, or irrational. Great Oaks offers no cogent criticism of the ratio adopted by the District, instead quoting the advisory reports while mysteriously asserting that the agricultural rate "is not at issue here." The most cogent evidence on the reasonableness of the District's ratio may be Great Oaks's own schedule of rates, under which it charged agricultural customers *less* than one-tenth of what it charged residential customers—$0.162 and  $1.723 per 100

situation. *If this assertion is valid*, it is not surprising, in light of the considerable growth in Santa Clara County and the evolving environmental mandates." (Italics added.)

cubic feet, respectively. While this is hardly conclusive, it casts still more doubt on the trial court's conclusions, which apparently rested on recommendations of a purely suggestive and tentative character. We see no basis to conclude that the District acted arbitrarily or capriciously, or in defiance of the evidence, in adopting the ratio it adopted.

In sum, nothing we have found in this record supports a determination that the District's adoption of the 2005-2006 groundwater extraction charge was arbitrary, capricious, or unsupported by evidence.

### 3. Misuse of Proceeds

The trial court also found that the District abused its discretion in spending the proceeds of the groundwater extraction charge. Although stated as a distinct finding, and based upon distinct aspects of the District's conduct, this misuse-of-funds theory seems conceptually to be merely the other side of the miscalculation-of-costs theory discussed above. The chief distinction between the two seems to be remedial: an overcharge might warrant a refund, while the expenditure of funds on activities in violation of restrictions on their use might more logically trigger some other remedy, such as a prohibition of future such misapplications, or perhaps a transfer of funds from unauthorized activities to authorized activities, perhaps with a corresponding reduction in groundwater charges. Suffice it to say that this is another point on which proper analysis was impeded by the parties' treatment of the matter as a garden-variety civil action, without focusing on the true nature of the obligations Great Oaks sought to enforce and the remedial consequences that flowed from such an analysis.

The court explained its misapplication-of-funds finding as follows: "The District improperly used groundwater revenue for activities not within the scope of Section 26.3 of the Act. The District unwisely commingled groundwater revenue with other monies. The [District] over budgeted for employees, cost of equipment and water contract purchases to the detriment of Great Oaks by placing the excess money in its reserve fund,

75

thus the Plaintiff was overcharged for groundwater fees and not credited back when appropriate."

This finding also appears to rest largely on the testimony of Great Oaks accounting expert O'Rourke, who described several practices by which the District had built a large reserve fund at the expense of ratepayers. He first described a practice involving what he called "phantom employees," whereby the District would budget an anticipated hire from the beginning of the financial period even though the position might not be filled, and the District might not intend to fill it, until months later. "[T]he person who's budgeted wasn't there the full budget period. So the net difference goes to reserves or becomes an increment of profit. Since they're [a] 'non for profit entity' it builds up their cash balance." He appeared to say that the District had about 90 such "phantom employees," which was roughly 10 percent of its total workforce. O'Rourke described this practice as a product of "the way the District calculates their budget," which "encourages them to set the budget amount as high as possible[,] [s]o that when they make the computation for the rate for groundwater[,] they've got that amount recovered. In subsequent budgets there is no refund of prior year over recoveries or over budget amounts."

Similarly, he testified, the District had a practice of assigning excessive charges, which he said had been so declared by the county auditor's office, for interdepartmental equipment use. This practice too operated to fund a "very large reserve surplus" and violated "both State Controller and . . . U.S. Controller's Office . . . regulations." A third practice involved relying on initial estimated prices for State Water Project water, while ignoring any subsequent downward adjustments in the actual price paid.

By means such as these, O'Rourke testified, the District had amassed reserves of some $110 million prior to imposition of the 2005-2006 groundwater charge. He compared this sum to the District's annual revenues of about $100 million. He opined

76

that the District used these reserve funds to finance "discretionary" investments, as "an alternative to borrowing funds." This had the effect of "front[-]load[ing] the expenditure" for projects, so that they were paid for by current users, in contrast to an investment financed with borrowed funds which would be repaid over the life of the asset by users actually benefiting from it. Insofar as the groundwater charge is used for such purposes, he opined, it "includes amounts for potential or future services or use."

While we do not wish to minimize the character of the practices thus described, we are once again left to guess at what evidence or rule of law supports the conclusion that they violated the District Act. Section 26.3 authorizes the District to use groundwater proceeds for specified activities. It does not forbid the District from attempting to estimate the cost of such activities prior to engaging in them; indeed, it is difficult to conceive how it could function without such forward budgeting. Nor does it place any express limits on how far in advance of planned activities the District may begin to accumulate funds for eventual application to them. There may be some applicable rule, custom, or other norm making it an abuse of discretion not to allocate surplus funds to present activities so as to reduce the burden on payers of the groundwater charge or other rates. But apart from the bald conclusions of an expert witness, nothing before us supplies any foundation on which to make such a declaration. We do not believe the acts of a public agency exercising the delegated power of the Legislature may be so lightly overturned.

We conclude that the trial court's findings of violations of the District Act cannot be sustained on the present record.

### III.  Capacity Charge

Finally we will briefly acknowledge the District's contention that the challenged charge is, at least in part, a capacity charge, and thus subject to the Mitigation Fee Act, Government Code sections 66000 et sequitur. If accepted, this proposition would bar any

77

challenge to the fee—or at least to the portion constituting a capacity charge—pursuant to Government Code section 66022, which provides that any judicial challenge to a capacity charge must be filed within 120 days after the charge is adopted.[27] The trial court appears not to have specifically addressed this question, which the District raised in Phase 2, but which Great Oaks argued—and continues to argue—was forfeited by the District's failure to raise it in Phase I.

It is impossible in the present state of the case to resolve the many issues the parties have raised in connection with this defense. The defense is at most a partial one, requiring that some basis be found for determining how much of the groundwater charge, if any, satisfies the definition of a capacity charge. (See Gov. Code, § 66013.) For that reason we do not believe that it was waived by the District's failure to raise it in Phase I, which was supposed to be limited to issues of liability, reserving issues of remedy— including the allowable monetary relief—to Phase 2. In any event, as previously noted our reversal of the judgment will set the matter at large, presumably for retrial, and these issues can be addressed anew if the parties again elect to place them before the trial court. We decline to issue an advisory opinion on a subject so fraught with untried and as-yet unfocused subsidiary issues.

### DISPOSITION

The judgment is reversed for further proceedings consistent with this opinion. This disposition renders moot the companion appeal, in which Great Oaks challenged the

---

[27] As in effect when the present charge was imposed, the statute provided in relevant part, "(a) Any judicial action or proceeding to attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee or service charge, adopted by a local agency, as defined in Section 66000, shall be commenced within 120 days of the effective date of the ordinance, resolution, or motion. [¶] . . . [¶] (c) This section shall apply only to fees, capacity charges, and service charges described in and subject to Sections 66013 and 66014." (Former Gov. Code, § 66022, as in effect through Dec. 31, 2006.)

trial court's order denying its motion for attorney fees.  Accordingly, that order will be affirmed by separate opinion.  (See *Great Oaks Water Co. v. Santa Clara Valley Water District*, No. H035885.)

_____

RUSHING, P.J.

WE CONCUR:

_____

PREMO, J.

_____

ELIA, J.

*Great Oaks Water Company v. Santa Clara Valley Water District*
**H035260**

Trial Court:                                    Santa Clara County Superior Court
                                               Superior Court No.: CV053142


Trial Judge:                                   The Honorable Kevin J. Murphy


Attorneys for Defendant and Appellant          Hanson Bridgett
Santa Clara Valley Water District:
                                               Joseph M. Quinn
                                               Adam Hofmann

                                               Office of District Counsel
                                               Santa Clara Valley Water District

                                               Stanly T. Yamamoto

Attorneys for Plaintiff and Respondent         Silicon Valley Law Group
Great Oaks Water District:
                                               Jeffrey S. Lawson

                                               Johnson & James

                                               Robert K. Johnson
                                               Omar F. James

                                               Great Oaks Water Company

                                               Timothy S. Guster

Attorney for Amicus Curiae                     Daniel S. Hentschke
Association of California Water Agencies:




*Great Oaks Water Company v. Santa Clara Valley Water District*
**H035260**

81